## Adoption of Rico.[1]

No. 07-P-1883.

Hampden. April 4, 2008. - July 11, 2008.

Present: Graham, Dreben, & Wolohojian, JJ.

Further appellate review granted, 452 Mass. 1103 (2008).

*Minor,* Adoption, Custody, Visitation rights. *Adoption,* Dispensing with parent's consent, Visitation rights. *Parent and Child,* Dispensing with parent's consent to adoption. *Evidence,* Child custody proceeding. *Practice, Civil,* Findings by judge.

In a proceeding for termination of parental rights, the judge's finding of the father's unfitness was supported by clear and convincing evidence, and her subsidiary findings were amply supported by the record. [217-218]

In a proceeding for termination of parental rights, the trial court judge, after concluding that the child's current best interests required parental posttermination visitation, did not abuse her discretion by not including a fixed schedule for visitation or by giving the Department of Social Services and the future (as yet unidentified) adoptive parents the discretion to determine the schedule for such visitation. [218-220]

In an appeal from a proceeding for termination of parental rights, this court remanded an order concerning sibling visitation to the trial court for further findings and rulings concerning whether — and, if so, how often — sibling visitation is to occur. [220-221]

Petition filed in the Hampden County Division of the Juvenile Court Department on May 15, 2000.

The case was heard by *Rebekah J. Crampton Kamukala,* J.

*Jeanne M. Kaiser* for the father.

*Robert E. Young* for the child.

*Annapurna Balakrishna,* Assistant Attorney General, for Department of Social Services.

Wolohojian, J. After a trial that continued over thirteen days, a Juvenile Court judge issued a lengthy, detailed decision finding unfit the mother and two of the fathers of the five children who were the subject of the case; terminating parental rights,

[1]A pseudonym.

pursuant to G. L. c. 210, § 3; and approving, but not mandating, parental and sibling postadoption visitation. Only one of the fathers and his biological son, Rico, have appealed. The father appeals the finding that he is unfit and the visitation order; Rico appeals the visitation order only.

*Factual background.* The factual findings by the Juvenile Court judge are detailed and amply supported by the evidence. We recite here only a summary of those findings pertaining directly to the father and Rico. The Department of Social Services (DSS) first learned about the family in November, 1998, when Mercy Hospital filed a G. L. c. 119, § 51A, report because the mother had twice screened positive for cocaine during the pregnancy with her third child. DSS closed the case after investigation when it found no evidence of alcohol abuse, domestic violence, or further drug use.

The family next came to DSS's attention in May, 2000, as a result of an emergency § 51A report made in connection with the accidental shooting of Rico's younger sister, Felicia,[2] who was eighteen months old at the time. That report was supported by a G. L. c. 119, § 51B, investigation. Felicia was accidentally shot when the father was cleaning one of several guns stored in the apartment.[3] Nine firearms were found in the apartment by the police, including a stolen gun containing live ammunition that was stored under the bed upon which Felicia had been sleeping at the time she was shot.[4] In addition to the firearms, police also found ammunition, a large pit bull terrier, and a "fortified" door.[5] The police informed DSS that the family's apartment had been under surveillance by the narcotics bureau, which suspected the father of being a drug dealer.

Even before the shooting, things were far from ideal in the household. The father had been dealing drugs. The father had

---

[2] A pseudonym.

[3] The shot hit Felicia in her buttock and caused extensive and permanent damage to her right leg and hip.

[4] The father also had an AK-47 assault rifle. It was removed from the apartment after the shooting — but before police arrived — and taken to a relative's apartment. Once there, the AK-47 was stored with a loaded clip under a bed upon which the other children (who were also taken to this relative's apartment) were resting.

[5] Unsanitary conditions, including dog feces, were also found in the apartment.

been having a sexual affair for a few years with a seventeen year old neighbor. That relationship was a source of tension and distress in the family, in part because it was known to the children, who witnessed confrontations (including physical fights) between their mother and the neighbor. The children had not been uniformly immunized and apparently were not regularly seen by a pediatrician.

After the shooting, the children were immediately removed from the parents' care. Rico was three at the time. About one month after the children were removed, the apartment was raided and the father and mother were charged with possession of a class A substance and possession with intent to distribute a class A substance. The father was convicted[6] and sentenced to from four to six years due to the shooting of Felicia and was convicted of distribution of a class A substance (heroin) and a class A substance (cocaine) and given sentence of eighteen months and one day.

When first incarcerated, the father did not participate in any of the recommended programs available to him in prison, and he fought with other inmates, which resulted in his being placed in a higher security facility. But things improved over time; the father became a better prisoner and took courses[7] required on his service plan. Since his release in July, 2005, however, the father has not participated in any of the programs required by his service plan. He has refused to sign his plan and has not participated "in any services that would assist him in reunification with [Rico]." The father's domestic arrangement is murky. The father denied at trial that he was involved in a relationship with Rico's mother; but his parole officer testified that he has seen women's clothing at the father's apartment and that the father told him that he was living with Rico's mother and that she was his wife.[8]

The only service the father has participated in since his release from prison is visiting Rico, which he has done consistently.

---

[6] The father was convicted of assault and battery of a child, assault and battery by means of a dangerous weapon, discharging a firearm, and knowingly receiving stolen property.

[7] The father took all courses that were available to him.

[8] The father and the mother have never been married.

Although there is evidence of the father's affection for Rico, he has little day-to-day knowledge about his son: at the time of trial, he did not know what grade Rico was in, how he was doing in school, or whether he has special educational needs. He knew, however, that Rico was interested in sports.

For a variety of reasons, Rico has not been in a stable placement since he was removed from his biological parents. At oral argument, counsel represented that Rico is currently placed with a preadoptive family (not his first) and receiving monthly visits with the father. All involved agree that Rico has a strong bond with the father and enjoys his visits with him.

*Termination of parental rights.* Parental unfitness to provide for the welfare and best interests of a child under G. L. c. 210, § 3, must be proved by clear and convincing evidence. *Adoption of Don*, 435 Mass. 158, 164-165 (2001). Subsidiary findings must be supported by a preponderance of the evidence, and those findings will not be disturbed unless clearly erroneous. *Ibid.* A finding is "clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Custody of Eleanor*, 414 Mass. 795, 799 (1993), quoting from *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977).

We consider the judge's finding of the father's unfitness supported by clear and convincing evidence and her subsidiary findings amply supported by the record. Although the evidence demonstrates an undeniable and strong emotional bond between Rico and the father, and the father has a commendable record of regular visitation both while incarcerated and since his release, he is in no position to parent Rico. As of the time of trial, the father continued to have limited — if any — understanding of the significance or seriousness of the environment of violence in the home he had provided to his children. He demonstrated little understanding of the reasons why the children had been initially removed. He continued to minimize his role in and responsibility for Felicia's shooting. His domestic situation since his release from prison was unclear, and not frankly described to his parole officer. Apart from visiting Rico, he has met none of the require-

ments of his service plans, including attending parenting or anger management programs. In these circumstances, there was no error in terminating the father's parental rights.

*Visitation.* In that section of her decision entitled "Adjudication, Commitment and Order to Issue Decrees," the judge "approve[d] of post-adoption contact with the known parents as long as it is deemed appropriate by the Department and the adoptive families and it remains in the best interests of the children." With respect to sibling visitation, the judge similarly "approve[d] of sibling visitation as long as it is deemed appropriate by the Department and the adoptive families and it remains in the best interests of the children." The judge did not order a specific schedule or number of visits.

Somewhat confusingly, an earlier portion of the decision pertaining to Rico within the "Findings of Fact" section contains the following:

> "218. It is the opinion of the adoption social worker, *and this court so finds*, that [Rico] should have post-adoption contact with Mother and [the father], and that it should occur with face to face visits at least twice a year. She has seen visits with [Rico] and his father and she knows that there is an attachment between them.

> "219. The adoption worker also believes that [Rico] should be allowed to have sibling visitation with [his brothers].

> "220. The plan for post-adoption contact for [Rico] with family members is as follows: [Felicia] (no contact per recommendation of [Felicia's] therapist), [two younger brothers] (limited contact), [older brother] (one visit between the two of them per year and they can maintain contact via letters and phone calls), biological parents (the department will be speaking with pre-adoptive candidates about.[Rico's] connection to his birth parents and possible need to maintain some sort of connection to them)."

(Emphasis added.) The father contends that these paragraphs are inconsistent with the judge's ruling regarding posttermination parental visitation. This claimed inconsistency, as well as the fact that the judge gave authority to DSS and future (unidenti-

fied) adoptive parents to determine future visitation, are the issues on appeal. The father and Rico contend that the judge abused her discretion by leaving the decision-making for future visits to DSS and the adoptive parents and by not ordering a number and schedule for future visits. Our analysis of these issues differs with respect to parental and sibling visitation and, therefore, we discuss them separately *infra*.

a. *Parental visitation.* A judge "*may* order limited postadoption contact, including visitation, between a child and a biological parent where such contact is currently in the best interests of the child" (emphasis added). *Adoption of Vito*, 431 Mass. 550, 553 (2000). Where, as here,[9] no preadoptive parent has yet been identified, "the equitable authority of the judge may be especially important in safeguarding the child's best interests." *Id.* at 560.

Although the court has inherent equitable power to order postadoption contact, that power is to be exercised in such a way as to avoid "unnecessary involvement of the courts in long-term, wide-ranging monitoring and enforcement of the numerous postadoption contact arrangements [that] could result from too ready an application of the court's equitable power to issue contact orders." *Id.* at 563. Because an order of postadoption contact "affects the rights of the adoptive parents to raise their children, the order should be carefully and narrowly crafted to address the circumstances giving rise to the best interests of the child." *Id.* at 564. The purpose of the contact is not to strengthen the bonds between the child and his biological parent, but rather to "assist the child as he negotiates, often at a very young age, the tortuous path from one family to another." *Id.* at 565.[10]

A judge, when fashioning a postadoption visitation order, is necessarily constrained by her knowledge of the child's current best interests. What is in the best interests of the child at the time the order is issued may not be the same in the future when circumstances have changed. See *id.* at 563. For this reason, even where, as here, a judge determines that the child's current best

---

[9]This was the situation at the time of trial. As mentioned, at oral argument, counsel represented that Rico is currently in a preadoptive placement.

[10]Applying these principles, the Supreme Judicial Court held clearly erroneous an order requiring postadoption parental visitation where the child had already formed a bond with his adoptive family and had little attachment to his biological family. *Adoption of Vito, supra.*

interests require posttermination or postadoption visitation, it is within a judge's discretion not to order a fixed, permanent schedule for such visits. A judge's discretion in this area is broad. See *Adoption of Edgar*, 67 Mass. App. Ct. 368, 372 (2006), and cases cited. A judge may well determine that flexibility in this regard serves the child's best interests more accurately than a fixed schedule determined at some previous point in time when the child's best interests may have been different. Thus, although one of the judge's findings of fact might be read to suggest a fixed schedule of parental visitation, there was no error in not including a fixed schedule in the order itself. Nor is there any inconsistency between the judge's findings and her rulings regarding visitation, because a finding that twice yearly visits are in the child's current best interests is not inconsistent with a ruling leaving the schedule open in the future.

Nor was there error in leaving discretion to DSS and the future adoptive parents. Rico's adoptive parents will be in the best position to determine what visitation is in the child's best interests as he grows up. *Adoption of Gwendolyn*, 29 Mass. App. Ct. 130, 139 (1990). See *Adoption of Vito, supra* at 565. Where, as here, adoptive parents have not yet been located, discretion as to what schedule for posttermination visitation continues to be in the best interests of the child can appropriately be left to DSS. *Care & Protection of Georgette*, 54 Mass. App. Ct. 778, 785 n.10 (2002), *S.C.*, 439 Mass. 28 (2003) (posttermination visitation can be left to the discretion of DSS). As a practical matter in this case, no harm has been caused by leaving discretion to DSS in regard to posttermination visitation. DSS agrees that continued visits with the father are in Rico's current best interests and visits are taking place monthly. There is no indication that DSS will not continue to arrange or permit visits between Rico and the father as long as they continue to be in Rico's best interests.

b. *Sibling visitation.* Unlike parental visitation (which is left to the equitable power of the court), sibling visitation is required by statute to be considered and, if appropriate, ordered by the court:

"The court *shall*, whenever reasonable and practical, and

based upon a determination of the best interests of the child, ensure that children placed in foster care who are separated from siblings who are either in other foster or pre-adoptive homes or in the homes of parents or extended family members, have access to, and visitation rights with, such siblings throughout the period of placement in the care and custody of the commonwealth, or subsequent to such placements, if the children or their siblings are separated through adoption or long-term or short-term placements in foster care.

"The courts *shall* determine, at the time of the initial placements wherein children and their siblings are separated through placements in foster, pre-adoptive, or adoptive care, that such visitation rights be implemented through a schedule of visitations or supervised visitations, to be arranged and monitored through the appropriate public or private agency, and with the participation of the foster, pre-adoptive or adoptive parents, or extended family members, and the child, if reasonable, and other parties who are relevant to the preservation of sibling relationships and visitation rights."

G. L. c. 119, § 26(5) (emphases added), inserted by St. 1997, c. 43, § 99. These provisions reflect a legislative determination that the judge must decide whether and, if so, how sibling visitation is to occur. Section 26(5) requires the judge to determine not only whether sibling visitation is to occur, but also the schedule and conditions of visitation. *Adoption of Galvin*, 55 Mass. App. Ct. 912, 913-914 (2002).

Here, we read paragraph 220 of the judge's decision as containing the judge's finding as to the DSS's visitation plan (see *supra*), rather than her own ruling as to the schedule and conditions for sibling visitation. Accordingly, we remand the matter to the trial judge to make explicit (a) her findings and ruling as to whether sibling visitation is in Rico's best interests and, if so, as to which siblings; and (b) her findings and rulings as to the schedule and means by which such visitation is to occur. In all other respects, the decree is affirmed.

*So ordered.*