## Adoption of Rico.[1]

Hampden. March 3, 2009. - May 7, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Minor,* Visitation rights. *Adoption,* Visitation rights, Dispensing with parent's consent. *Parent and Child,* Dispensing with parent's consent to adoption.

In a proceeding for termination of parental rights, the judge abused her discretion in failing to order postadoption (or posttermination) visitation between the father and the child (as well as between the child and his siblings), and in leaving such contact to the discretion of the Department of Children and Families and any adoptive family, where the evidence was undisputed that there was a strong bond between the father and the child, where the judge found that the child should have postadoption contact with his father, and where the evidence reflected that there were no identified adoptive parents or a situation where adoption of the child was within reasonable sight. [753-759]

Petition filed in the Hampden County Division of the Juvenile Court Department on May 15, 2000.

The case was heard by *Rebekah J. Crampton Kamukala,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Robert E. Young* for the child.

*Jeanne M. Kaiser* for the father.

*Annapurna Balakrishna,* Assistant Attorney General, for Department of Children and Families.

*Andrew L. Cohen,* Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

Botsford, J. Rico is currently twelve years old and has been in the custody of the Department of Social Services[2] (department or DCF) since he was three years old. In 2006, after thirteen days

---

[1]A pseudonym adopted by the Appeals Court. See *Adoption of Rico,* 72 Mass. App. Ct. 214, 214 n.1 (2008).

[2]The Department of Social Services is now known as the Department of Children and Families. See G. L. c. 6, § 172B, as amended by St. 2008, c. 176, § 8 (effective July 8, 2008). We use the current name of the agency (department, or DCF) in this opinion.

of trial in a consolidated care and protection proceeding involving Rico, his four siblings, the children's biological mother, and two fathers, a judge in the Juvenile Court determined pursuant to G. L. c. 119, § 26, and G. L. c. 210, § 3, that the parental rights of Rico's biological mother and father should be terminated,[3] and she dispensed with parental consent to the adoption of three of the children, including Rico.[4] The judge further "approve[d] of postadoption contact" between these children and their "known parents" but did not order it, and "approve[d] of" sibling visitation but did not order it; she left the determination in each instance up to the department and "the adoptive families."

Rico and his father (father) appealed from the judge's decision to the Appeals Court. The father appealed from the determination of parental unfitness and also the determination concerning parental contact; Rico appealed from the latter determination as well as the one concerning sibling visitation. The Appeals Court upheld the trial judge's decision to terminate the father's parental rights, finding that it was supported by clear and convincing evidence, and also affirmed the judge's determination regarding parental contact. The court, however, remanded the judge's order concerning sibling visitation for further explicit findings and rulings on the issue. *Adoption of Rico*, 72 Mass. App. Ct. 214, 217-218, 219-221 (2008). We granted the child's and the father's applications for further appellate review, which focus primarily on the issue of parental visitation or contact. We agree with the Appeals Court that further rulings or orders on sibling visitation are required. However, for the reasons that we shall discuss, we conclude that on the record of this case, the judge also should have entered a specific order or orders for posttermination and postadoption visitation or contact between the child and the father. Accordingly, we remand the matter to the Juvenile Court for further proceedings on this issue as well as the issue of sibling visitation.[5]

---

[3]The judge also terminated the parental rights of the other father who was a party.

[4]At earlier points in this lengthy case, Rico's sister, one of the children on whose behalf the care and protection petitions were originally filed, was adopted, and the father of Rico's older half-brother — also one of the original children in the case — was granted custody of his son.

[5]We acknowledge the brief filed by the Committee for Public Counsel

1. *Background.* The Appeals Court's decision provides a generous description of the findings by the Juvenile Court judge and the history of the relationship between Rico's family and the department. *Adoption of Rico*, 72 Mass. App. Ct. at 214-218. We recite here only a brief summary of the judge's findings concerning Rico and the father that are relevant to the issue of posttermination or postadoption contact.

Rico, born in 1997, was placed in the care of the department in May, 2000, after an incident in which his father accidentally shot Rico's younger sister, Felicia,[6] in the right buttock. The father was convicted in 2001 of offenses relating to the shooting of his daughter as well as distribution of cocaine and heroin; he received a sentence of from four to six years for the shooting and a suspended sentence on the drug convictions. The father was released from prison on July 5, 2005. As the Appeals Court noted, *Adoption of Rico*, 72 Mass. App. Ct. at 215-218, the judge's comprehensive findings demonstrate the father's unfitness to parent Rico. The judge did find, however, that while the father had failed or refused to comply with almost all of the provisions of his DCF service plan since his release from prison in 2005, the one service in which he consistently participated was visiting with Rico on a monthly basis.

During his first year in the custody of the department, Rico was placed in foster care with the intent of being reunited with his birth parents. However, since 2001, the department's goal for Rico has been adoption rather than reunification. At the time of trial in 2006, Rico had been in four foster homes while in the department's custody. The judge described Rico as a child with "emotional issues such as adjustment disorder, general anxiety disorder and post traumatic stress disorder," but found that in June, 2005, he began a preadoptive placement that, despite rocky periods, seemed to be going well as of early March, 2006, and that Rico was "very happy at that time." However, by the end of March, the placement had disrupted — an event the DCF adoption social worker believed would make Rico "very sad and

---

Services as amicus curiae in support of Rico and the father.

[6]Also a pseudonym adopted by the Appeals Court. See *Adoption of Rico*, 72 Mass. App. Ct. at 215 n.2.

angry" — and there was "no identified adoption resource" for Rico.[7] The judge further found that early family trauma (including, importantly, the shooting incident involving Rico's father and sister) was at the root of his emotional problems, but that he missed his parents and felt loyalty toward them.[8] The judge then found:

> "It is the opinion of the [department's] adoption social worker, and this court so finds, that [Rico] should have post-adoption contact with Mother and his father . . . and that it should occur with face to face visits at least twice a year. [The social worker] has seen visits with [Rico] and his father and she knows that there is an attachment between them."

Following findings with respect to each of the parents and children involved in the proceeding, the judge concluded her decision with a section entitled "Adjudication, Commitment and Order to Issue Decrees," which sets out her ultimate findings and orders. Rather than address posttermination or postadoption contact between each child and his or her parents on an individual basis, the judge considered this issue in a single paragraph that treats all the children[9] as a unit:

> "The court approves of post-adoption contact with the known parents as long as it is deemed appropriate by the [d]epartment and the adoptive families and it remains in the best interests of the children."

---

[7]The judge added a note to her findings that at a permanency hearing held on October 2, 2006, after the evidence in the termination proceeding at issue here had closed, it was reported to the judge that Rico had been placed in another preadoptive home in June, 2006, and was doing very well there. The record in this case, however, is confined to the termination proceeding, and does not include any evidence concerning this preadoptive placement. No one has informed us or suggested to us that Rico has been adopted between 2006 and the present, or is about to be adopted.

[8]The judge found: "[Rico] says[,] 'I wish there was more than one of me, as I want to stay in my foster home, but I want another [Rico] to live with Dad.' [Rico] says he loves his parents and enjoys visits with them."

[9]As previously noted (see note 4, *supra*), the custody of two of the five children who were originally involved in the case was no longer at issue at the time of the judge's decision. It is clear that the judge's determination concerning postadoption contact with biological parents does not apply to them.

She adopted the same approach to sibling visitation, stating:

> "The court approves of sibling visitation as long as it is deemed appropriate by the [d]epartment and the adoptive families and it remains in the best interests of the children."[10]

2. *Discussion.* In their appeals in this court, Rico and the father challenge only the order of the judge dealing with "postadoption" contact or visitation between them.[11,12] They argue that on the record of this case, where the evidence was undisputed that there is a strong bond between the father and Rico, where the judge found that Rico should have postadoption contact with the father, and where the trial evidence reflected that there were no identified adoptive parents or a situation where adoption of Rico was within reasonable sight, the judge abused her discretion in failing to order postadoption (or posttermination) visitation between the father and Rico, and in leaving such

---

[10] The judge also makes reference to the substance of the quoted determinations concerning sibling and parental visitation in the introduction to her decision, where she summarizes her findings on termination of parental rights and then states: "Mother, [Rico's father,] and [the other father], as well as siblings, [will] have the right to visit with their respective children, if it is determined by [DCF] and/or the respective adoptive parent(s) that it is in each child's best interest."

[11] The judge's order concerning parental visitation uses the term "postadoption" only, and the same is true of her earlier finding on the subject. The term "posttermination" visitation is not expressly mentioned. The Appeals Court appears to have inferred that the judge intended the order to cover both posttermination (that is, visitation following termination of parental rights but before adoption) and postadoption visitation by the parents. See *Adoption of Rico*, 72 Mass. App. Ct. at 219-220. We read the order in this way as well, and therefore consider the judge's order to apply both to the posttermination, preadoption period and any postadoption period.

[12] As indicated at the outset, Rico's appeal to the Appeals Court focused on the trial judge's visitation orders with respect both to the father and to his siblings. The Appeals Court, as has been mentioned as well, remanded the judge's visitation order concerning sibling visitation for further findings. *Adoption of Rico*, 72 Mass. App. Ct. at 221. Rico agrees that remand is appropriate for this purpose, and the department also does not challenge the Appeals Court's ruling in this respect. For the reasons discussed by the Appeals Court, *id.* at 220-221, we agree that the judge should have specified in an order or orders whether sibling visitation would be in Rico's best interests; if so, visitation with which siblings; and, if so, the form of visitation (in person contact or otherwise), and the schedule of such visitation. We do not discuss this issue further.

contact to the discretion of the department and any "adoptive family." We agree.

In *Adoption of Vito*, 431 Mass. 550 (2000), this court discussed at some length the equitable power of a judge to order posttermination and postadoption contact, including visitation, between a child and his biological parents, *id.* at 556-558, while also recognizing that there are limits to that power. The limits, we said, derive from the necessity to respect the policy directives underlying the Commonwealth's statutes governing adoption as well as the constitutional rights of adoptive parents to raise their child without undue intrusion by the State. *Id.* at 561-563. We stated that generally an order requiring postadoption contact would be "unwarranted," *id.* at 563, where (as in the *Vito* case itself) "the child has formed strong, nurturing bonds with his preadoptive family, and there is little or no evidence of a significant, existing bond with the biological parent." *Id.* But we also noted that an order for postadoption contact is more likely "where no preadoptive family has yet been identified, and where a principal, if not the only, parent-child relationship in the child's life remains with the biological parent," *id.* at 564; and that in such cases, when the parental rights of the biological parents are terminated, "the court has the authority *and responsibility* to intervene in [the child's] best interests" (emphasis added). *Id.* at 564 n.24. See *id.* at 558, citing and quoting J. Story, Commentaries on Equity Jurisprudence as Administered in England and America §§ 1327-1329, 1333-1334, 1352, 1353 (13th ed. 1886). Cf. *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 827-828, cert. denied, 528 U.S. 1005 (1999) (probate judge's duty as parens patriae requires exercise of his or her broad equity powers to protect child's best interest, including, here, order for visitation between child and de facto parent). The best interests of the child are the overarching and governing concern. *Adoption of Vito*, 431 Mass. at 564 & n.24, 565. See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702 (1984). See also *Youmans* v. *Ramos*, 429 Mass. 774, 783, 785-786 (1999).

The passages just quoted from *Adoption of Vito, supra,* apply to this case. Insofar as Rico is concerned, the evidence presented during the termination proceeding demonstrated that (1) the parental rights of both Rico's mother and father should be term-

inated; (2) Rico was losing his existing placement with a pre-
adoptive family and no new preadoptive family had been identified;
(3) Rico was then nine years old and had been placed in four
foster homes during the previous six years; and (4) the principal
parent-child relationship in Rico's life was the one between Rico
and his father, with whom he had formed a strong bond. As the
*Vito* case suggests, these are precisely the circumstances in which
an order for posttermination as well as postadoption contact may
be appropriate and warranted. See *Adoption of Lars*, 46 Mass.
App. Ct. 30, 31, 35-37 (1998), *S.C.*, 431 Mass. 1106 (2000) (af-
firming court order for postadoption visitation where siblings,
aged six to ten years, had bonded with biological mother over
years and were in frequent contact with her long past infancy,
and no preadoptive home identified). See also *Adoption of John*,
53 Mass. App. Ct. 431, 439-440 (2001) (remanding case to trial
judge for further proceedings on postadoption visitation because
Appeals Court was "unable to conclude whether the judge's
order leaving visitation in the discretion of the adoptive parents
reflects a determination that no significant bond exists between
John and his mother or whether, to the contrary, the finding that
it was in John's best interests 'to continue to have contact' reflects
a determination that such a bond exists, warranting an order for
postadoption contact").

DCF does not disagree that posttermination and even post-
adoption contact between Rico and the father is suitable and even
desirable in the present case. It argues, however, that the judge
appropriately did not enter an order requiring this result and
"micromanaging" the issue of visitation because the record made
clear that the department advocated visitation between Rico and
his father,[13] and even expressed a commitment to seek an adop-
tive family that would be sensitive to Rico's need to stay con-
nected to the father.[14]

We do not question DCF's expressed commitment to support

---

[13]The department apparently has arranged for visits between Rico and the
father that generally occur on a monthly basis or, in any event, more frequently
than the two visits per year that the judge indicated in her findings would be
an acceptable minimum number.

[14]The department also contends that determining whether visitation is or
remains within a child's best interests is one of the incidents of custody that

visitation between Rico and the father. Nor is there dispute that a judge who finds parental unfitness to be established has broad discretion to determine what is in a child's best interests with respect to custody and visitation with biological family members thereafter. *Adoption of Hugo*, 428 Mass. 219, 225 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999). See *Adoption of Edgar*, 67 Mass. App. Ct. 368, 372 (2006). Nonetheless, in this case, given the judge's express finding, well supported by the record, that Rico should have postadoption (and posttermination) contact with the father in the form of at least two face-to-face visits per year, an order requiring such visitation was called for. A judicial order for posttermination or postadoption visitation with a biological parent is for the benefit of the child, a reflection of the judge's determination that, at that time, the child's interests would best be served by such an order. The order offers protection to the child that is absent if the judge leaves all visitation matters up to the department and future adoptive parents. It may be true, as the department argues in this case, that if visitation is left to the department's and adoptive parents' discretion, Rico may petition the court should either the department or the parents fail or refuse to allow contact with Rico's father. But this is a burdensome and uncertain avenue of relief for Rico, or any child. Certainly at the preadoptive stage, if an order for posttermination and postadoption visitation enters and the department should thereafter believe that such visits were no longer in Rico's best interests, it certainly has the ability and

by statute, see G. L. c. 119, § 21, lies within the discretion of a child's legal custodian, which, in Rico's case, is the department; accordingly, the argument goes, the judge "properly deferred" to DCF's discretion concerning the schedule and need for visitation in the first instance. The thrust of the department's argument is not entirely clear. However, we reject the suggestion, if it is being made, that in a proceeding in which the court terminates parental rights and leaves custody of the child with DCF, the judge may not, or at least should not, enter an order requiring visitation between a child and his biological parent unless DCF is shown — presumably on a later motion by the child — to have abused its discretion in refusing visitation. As *Adoption of Vito*, *supra*, makes clear, the judge in such a case has a responsibility independent of DCF to determine the best interests of the child who is before *the court*. *Id.* at 551. That determination may lead or even require the judge to order posttermination or postadoption visitation in the first instance. See *Adoption of John*, 53 Mass. App. Ct. 431, 439-440 (2001); *Adoption of Lars*, 46 Mass. App. Ct. 30, 35-37 (1998), *S.C.*, 431 Mass. 1106 (2000).

capacity to seek a revision of the visitation order from the court. See *Adoption of Edgar*, 67 Mass. App. Ct. at 369-370. And the same would be true of adoptive parents if the judge presiding over the adoption proceeding, see G. L. c. 210, § 6, were to enter a decree (or continue an earlier decree) for postadoption visitation with the biological parents.

The additional, but highly significant, value of a court order for posttermination or postadoption visitation (or both) in a case such as this is that it provides clarity and, perhaps more importantly, gives the child a present sense of security about his ability to maintain contact and a relationship with a person who has been shown to be critical to him.[15] If the current best interests of the child dictate posttermination and postadoption visitation with a biological parent because of the importance of the child's bond to his parent, it follows that the child's best interests will be advanced by assuring the child that the bond is going to be honored and protected by the power of the court. See *Adoption of Vito*, 431 Mass. at 564 n.24; *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. at 702-703.[16]

---

[15]Rico was nine years old at the time of the judge's decision, and is now twelve. For an older child like Rico, contact with a biological parent can provide support and continuity, and help the child deal with feelings of guilt and anger about a foster care or adoptive placement and thereby achieve a better adjustment to a new family. See Mendenhall, Adolescents' Satisfaction with Contact in Adoption, 21 Child & Adolescent Soc. Work J. 175, 178 (2004) (contact with birth parents helps children and adoptive parents better understand differences that exist between them and facilitate healthy adjustment); Berry, The Effects of Open Adoption on Biological and Adoptive Parents and the Children: The Arguments and the Evidence, 70 Child Welfare 637, 644 (1991) (continuance of contact between adopted children and their birth parents may be more important for older children). See also Appell, Blending Families Through Adoption: Implications for Collaborative Adoption Law and Practice, 75 B.U. L. Rev. 997, 1017 (1995). In addition, when a child has lived for some time with his biological parent or parents, his sense of identity is intertwined with the parents, and contact is important to that identity. See Littner, The Importance of the Natural Parents to the Child in Placement, 54 Child Welfare 175, 177-179 (1975). See also Grigsby, Maintaining Attachment Relationships Among Children in Foster Care, 75 Fams. In Soc'y 269, 269, 271-272 (1994).

[16]While an order for posttermination or postadoption visitation between a child and his biological parent must be premised on a determination of the child's best interests alone, rather than the interest of the biological parent, see *Adoption of Vito*, 431 Mass. at 562, it bears noting nonetheless that like the

We conclude with two further observations. It goes without saying that when a judge orders postadoption visitation or contact between a child and his biological parents as part of a termination proceeding, the judge does so based on the judge's assessment of the child's best interests *at that time*. Even though no preadoptive parents have been identified, as is true in this case, a postadoption visitation order that looks to the future may still be appropriate, for reasons we have discussed. But it bears emphasizing that it is in a sense a provisional order. The judge presiding over the termination case has no crystal ball, and cannot know whether the child's best interests will later change because of changed circumstances; current context is critical. See *Adoption of Edgar*, 67 Mass. App. Ct. at 373. If the child is later adopted, the judge presiding over the adoption proceeding pursuant to G. L. c. 210, § 6, will need to review the earlier decree and determine whether it continues to reflect the child's best interests. *Adoption of Vito*, 431 Mass. at 557 n.15, 559 n.18. See G. L. c. 210, § 5B.[17]

The second observation specifically concerns postadoption

child, a biological parent benefits from the clarity of such an order. If posttermination or postadoption visitation is left to the discretion of DCF or adoptive parents, a biological parent may still be entitled to seek an order for visitation from the court, see *Adoption of Terrence*, 57 Mass. App. Ct. 832, 840 (2003); *Adoption of Kristin*, 43 Mass. App. Ct. 915, 915-916 (1997), but as these cases illustrate, this is a difficult course to follow, procedurally and probably substantively as well.

DCF suggests that because his parental rights have been terminated and he has not appealed from that decision to this court, the father no longer has standing to challenge the judge's visitation order. The visitation order, however, was part of the adjudication of a termination proceeding to which the father was a party. The father appealed from the judge's decision, as he was entitled to do, and we have before us a further appeal from that decision. Given that this is a further appeal from the same decision, in the circumstances, the father may continue to press in the court his challenge to the visitation order, even though the child's interests must be the substantive point of focus in reviewing the validity of the order. Cf. *Adoption of Gregory*, 434 Mass. 117, 129 (2001) (appeal by biological parents from finding of parental unfitness and alleged refusal to order posttermination and postadoption visits); *Adoption of Terrence*, 57 Mass. App. Ct. at 833 (appeal by biological mother from termination of parental rights and lack of order for posttermination visitation); *Adoption of John*, 53 Mass. App. Ct. at 438-439 (appeal by biological mother from termination of parental rights and order leaving postadoption contact in adoptive parents' discretion).

[17]Of course, a posttermination order for visitation, entered at the time the

visitation orders. The *Vito* case emphasized that the existence, or not, of significant bonds between a child and his biological parent, as well as the existence, or not, of bonds between the child and a preadoptive or adoptive family, were important factors for a judge to weigh in determining whether to order postadoption contact. See *id.* at 562, 563-564, 565-566. Many other appellate decisions have focused on the issue of bonding as well. See, e.g., *Adoption of Greta*, 431 Mass. 577, 578, 588-589 (2000); *Youmans* v. *Ramos*, 429 Mass. at 783, 785-786; *Adoption of Edgar*, 67 Mass. App. Ct. at 370-371, 373-374; *Adoption of Lenore*, 55 Mass. App. Ct. 275, 283-284 (2002); *Adoption of John*, 53 Mass. App. Ct. at 439-440. But we draw attention to the fact that considerations beyond bonding may be relevant. We note that the *Vito* case itself referenced the need to consider, in addition to bonding, "other circumstances of the actual personal relationship of the child and the biological parent." *Adoption of Vito, supra* at 562. As some of the law review articles cited (see note 15, *supra*) suggest, a child who is adopted following termination of his parents' rights may benefit from contact with his birth parents even if he did not earlier form a strong bond with them. See, e.g., Appell, Blending Families Through Adoption: Implications for Collaborative Adoption Law and Practice, 75 B.U. L. Rev. 997, 1015-1017 (1995).

3. *Conclusion.* We conclude that in light of her findings with respect to Rico's best interests, the judge was obligated to enter orders for posttermination and postadoption visitation or contact between Rico and his father, as well as between Rico and his siblings. We remand this matter for further consideration and orders on these issues. Given the passage of time and length of this proceeding, we urge the judge to act as expeditiously as possible; we leave it to the judge to determine whether an evidentiary hearing will be necessary.

*So ordered.*

---

parents' rights are terminated, is also provisional in the sense we discuss here, subject to review in light of ongoing assessments of the child's best interests during subsequent permanency hearings held pursuant to G. L. c. 119, § 29B.