NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-880

ADOPTION OF RAHKEEM.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, the mother and the father appeal from Juvenile Court decrees finding each of them unfit to parent their child, Rahkeem, and terminating their parental rights to Rahkeem. The mother also appeals from the denial of her motion for a new trial, which argued that (1) Rahkeem's former temporary custodians should have been afforded counsel at hearings concerning Rahkeem's removal from, and possible return to, their custody; and (2) the judge should have mandated sibling visitation between Rahkeem and his maternal half-siblings (Jillian, Sam, and Angela).[2] We affirm.

Background. We summarize the facts found by the judge after trial, saving some details for later discussion. Ten

_____

[1] A pseudonym.

[2] Also pseudonyms.

months before Rahkeem was born, the Department of Children and Families (DCF) became involved with the mother when a report pursuant to G. L. c. 119, § 51A (51A report) was filed alleging neglect of her older children (Jillian, Sam, and Angela). After an investigation, the report was deemed supported due to mutual domestic violence between the mother and Filippo,[3] who is the father of Sam and Angela.

The mother became involved with the man who would become the father of Rahkeem;[4] that relationship was fraught with domestic violence. The father admitted to previous gang involvement and has a significant criminal history, with convictions for violent crimes, including armed assault with intent to murder for which he served a State prison sentence. At trial, in response to questions about his relationship with the mother, the father asserted his Fifth Amendment to the United States Constitution privilege. Throughout the proceedings, the mother denied or minimized the extent of the domestic violence in their relationship. She did obtain two G. L. c. 209A restraining orders against the father, but each lapsed after two weeks or less.

---

[3] Filippo is also a pseudonym.

[4] Hereinafter, all references to "the father" shall be to Rahkeem's father.

The mother has a long history of alcohol misuse, which she denied or minimized; she would not permit DCF or the court to verify her participation in substance use disorder treatment. The mother also has mental health diagnoses including depression, but would not allow DCF to speak to her clinicians and concealed from her therapist the extent of her alcohol consumption and her continuing relationship with the father. In addition, the mother's housing was unstable.

In February 2018, Rahkeem was born. In the first five months of Rahkeem's life, the mother failed to bring him to three medical appointments. In July 2018, a 51A report alleging neglect of Rahkeem was filed and later supported because of domestic violence between the mother and the father in the presence of Rahkeem, Sam, and Jillian. Responding officers saw several open beer containers and injuries to the mother, including swelling and blackness to her eye, but she denied that they were the result of domestic violence.

In October 2018, another 51A report alleging neglect of Rahkeem was filed and later supported after the mother and the father were fighting in public and bystanders called the police. When police arrived, the father was gone; the mother was intoxicated, her face was bloodied, and she refused to disclose her name. Rahkeem was nearby in the mother's car. The mother

3

denied that her injuries resulted from domestic violence, maintaining that she fell down stairs. The mother later admitted that the father had caused her injuries, which included a broken nose, and that Rahkeem was crying while the father was hitting her. A subsequent skeletal survey revealed that Rahkeem had a skull fracture. The mother later admitted that Rahkeem's skull fracture likely occurred during a domestic violence incident while she was holding Rahkeem, though at trial she denied having said that and claimed that Rahkeem fell from the bed while her older children were taking care of him or, alternatively, that Angela had dropped him. During the investigation, DCF obtained a photograph of Rahkeem lying next to a handgun; the mother refused to say when it was taken or who owned the handgun.

DCF filed this care and protection petition and was awarded temporary custody of Rahkeem.[5] Rahkeem was placed in a kinship

---

[5] The petition also alleged that Jillian, Sam, and Angela were in need of care and protection. In 2019, Jillian reached age eighteen and was no longer subject to Juvenile Court jurisdiction; she was dismissed from the case. On the last day of trial, the mother joined DCF's request for Sam and Angela to be placed in the permanent custody of Filippo. Decrees issued finding the mother unfit to parent Sam and Angela and placing them in the permanent custody of Filippo. The mother filed notices of appeal from those decrees, but did not enter those appeals in this court and does not raise in her brief any issues as to the care and protection of Sam and Angela. In those circumstances, we do not consider any issues concerning the care and protection of the mother's older children. We also note

4

foster placement with the mother's great aunt (aunt) and the aunt's son (cousin). During its custody of Rahkeem, DCF required that each parent's visits with Rahkeem be supervised and take place at a DCF office.

In April 2019, an anonymous 51A report was filed alleging neglect of Rahkeem because the mother was visiting him at the home of the aunt and cousin. After an investigation, that 51A report was unsupported, but concerns were noted that the home did not meet DCF's standards for a foster placement for reasons including that Rahkeem did not have his own bedroom.

Rahkeem filed a motion to be placed in the direct, temporary custody of the aunt and cousin. On May 29, 2019, the Juvenile Court entered an order granting temporary custody to the aunt and cousin until September 6, 2019. The conditions of temporary custody included that each parent's visits with Rahkeem would occur separately, in a public place, and be supervised by either the aunt or the cousin. Temporary custody was extended repeatedly for short intervals ranging from one to four months. Under the aunt's supervision, the mother was able to visit Rahkeem multiple times each week. At first the father's visits also were supervised by the aunt; he did not

---

that in 2023, Sam reached age eighteen and is no longer subject to Juvenile Court jurisdiction.

5

have a fixed schedule and sometimes weeks went by during which he did not visit Rahkeem.

Beginning in August 2019, the mother was living in a domestic violence shelter. She continued to see the father and to drink alcohol. In November 2019, a 51A report was filed alleging neglect of Rahkeem, Sam, and Angela by the mother and the father. The mother had gone to the aunt's home with the father seeking to take Rahkeem away with her. While the mother was there, Filippo arrived with Sam and Angela. The mother and the father engaged in an altercation with Filippo. The aunt locked the door to her home so that Rahkeem was not exposed to the altercation. The mother later admitted that at that time she was drinking a lot.

As a result of the incident and the parents' fighting with her, the aunt suspended the parents' visits with Rahkeem for about two months. Both parents blamed the aunt for the suspension of visits; the father tried to intimidate her, the mother tried to manipulate her, and both parents threatened her. The aunt told both the ongoing social worker and the court investigator that she would be afraid to testify against the parents, as she feared retaliation from the father if she told the truth, and so if she were required to testify in front of the parents, she would lie.

6

At a March 10, 2020, hearing, a Juvenile Court judge renewed the temporary custody order so that it awarded custody to only the aunt; subsequent orders also were in her name only. The judge also amended the conditions of custody so that the father's visits would be supervised by an independent social worker.  Soon after that hearing, in-person visits were suspended for several months due to the COVID-19 pandemic.  The father blamed the aunt for the suspension of visits and threatened to take her to court.  Once visits were reinstated, the father's visits continued to be supervised by the social worker, but the father did not appear consistently for weekly visits.

In December 2020, Chelsea police responded to a hotel for a domestic violence incident between the mother and the father. The mother was intoxicated and reported that the father had punched her, knocking out her tooth, but she refused medical treatment.

Less than a month before trial began, the mother entered a residential facility for treatment of substance use disorder, Casa Esperanza.  She was continuing to have contact with the father.  After the ongoing social worker arranged for the mother's visits with Rahkeem to be supervised by Casa Esperanza staff, the mother had some visits with Rahkeem there.

7

Trial began on January 15, 2021 and continued over twelve nonconsecutive days. On several occasions in early February 2021, Casa Esperanza staff told the mother that her continued contact with the father was putting her and other residents at risk, and if she persisted, she would be asked to leave the program. The mother was in complete denial about the risk to her safety. At about this time, the ongoing DCF clinical team met with the aunt and told her that the mother's visits with Rahkeem could be supervised by staff at Casa Esperanza, and the father's visits with Rahkeem were still to be supervised by the social worker.

As of early March 2021, two days of trial had taken place. The mother left Casa Esperanza, rescinding her releases so that DCF could not determine when or why she left. She deceived the aunt and cousin, telling them that she had completed the Casa Esperanza program and therefore, she could now have unsupervised visits with Rahkeem. The aunt needed someone to babysit Rahkeem while the cousin took her to an appointment for eye surgery on the morning of March 12. When the aunt told Filippo that she was planning to leave Rahkeem in the mother's care, Filippo advised her not to do so because the mother would bring Rahkeem to the father, which could result in harm to Rahkeem as had

happened in the past; the aunt replied that she was "desperate." It did not occur to the aunt to ask DCF what to do.

At 7 P.M. on March 11, 2021, the aunt and the cousin left Rahkeem at a hotel in Chelsea. At 11:45 P.M., police responded to a report of a fight at the hotel. The mother was in the hotel room with Rahkeem, then three years old. He had a bloody gash above his right eye and blood all over his face and shirt. The mother told police that Rahkeem's injury occurred when she and her boyfriend were fighting and Rahkeem was pushed; at trial she denied having said that, but the judge did not credit her denial. Rahkeem was taken by ambulance to a hospital. A 51A report was filed against the mother and the father.

At about 9 A.M. on March 12, the DCF emergency response worker and ongoing social worker arrived at the hotel. The mother, the father, and Rahkeem were in the hotel room, which was still in disarray, with multiple beer containers strewn around and dried blood on the floor and the sheets. Rahkeem was sitting on the bed with dried blood on his face, eyelashes, and shirt. When the DCF workers asked why the mother was not at Casa Esperanza, the mother lied, claiming she had successfully completed the program. The father and the mother at first denied the father's identity, intentionally misleading DCF.

Then the father screamed, "You can't take my son," and the mother told him in Spanish to "shut up."

The DCF workers spoke to the aunt, who admitted through a Spanish interpreter that she had dropped Rahkeem off with his "mom and dad" the night before so that the mother could babysit during the aunt's medical appointment. The aunt acknowledged that her doing so violated the court order requiring that the parents' visits with Rahkeem be supervised. The aunt admitted that Rahkeem had visited the mother at the hotel on a previous occasion and claimed that the ongoing social worker had approved that visit, which was not true. A 51A report was also filed against the aunt and later supported.

At an emergency custody hearing on March 15, 2021, see G. L. c. 119, § 24, the judge vacated the order granting temporary custody of Rahkeem to the aunt. Two days later, the father moved for custody of Rahkeem to be awarded to the aunt and the cousin.[6] The judge considered the father's motion in conjunction with the trial on the merits and permitted the father to call the aunt and the cousin out of order to testify.

---

[6] That motion is not in the appellate record, but from the transcript we infer that in it the father sought to award custody of Rahkeem to both the aunt and the cousin. At that point, the cousin had not been named as custodian of Rahkeem for more than one year. The five previous temporary custody orders named only the aunt as custodian, including the most recent one dated February 24, 2021.

Two months after the removal of Rahkeem from the aunt's temporary custody, DCF's goal for Rahkeem was changed to adoption.

After the close of evidence at trial, the judge denied the father's motion for custody of Rahkeem to be awarded to the aunt and cousin. On November 15, 2021, decrees entered terminating the mother's and the father's parental rights to Rahkeem. The judge ordered that the parents be offered posttermination visits for limited time periods (unless Rahkeem was placed in a preadoptive home prior to the expiration of those periods), but declined to mandate postadoption contact and or visitation between Rahkeem and either parent, entrusting those decisions to Rahkeem's guardian or adoptive resource. Both parents appealed.

The mother moved pursuant to Mass. R. Civ. P. 60 (b) (5), 365 Mass. 828 (1974), for a new trial, incorporating by reference arguments in a separate motion filed by the aunt and cousin asserting that as temporary custodians they should have been afforded counsel at the hearings pertaining to Rahkeem's removal from, and possible return to, their custody. The mother also argued that the judge should have mandated sibling visitation between Rahkeem and his three maternal half-siblings (Jillian, Sam, and Angela). The judge denied the motion for a

11

new trial and request for sibling visitation, and the mother appealed.

Discussion.  1.  Parents' appeals from the termination of their parental rights.  The mother and father concede their unfitness at the time of trial.[7]

a.  Competing permanency plans.  The parents argue that the judge abused her discretion in declining to adopt their proposed plans to place Rahkeem either in the custody of the aunt or in the custody of the aunt and the cousin.  We disagree.

The judge explicitly considered the parents' nominations of the aunt and the cousin as caretakers.  In doing so, the judge considered the testimony of the aunt and the cousin, much of which she did not credit.  In particular, the judge noted inconsistencies between their testimony about leaving Rahkeem at the hotel and the mother's testimony about the same event.  The judge also had in evidence a report of a home screening of the aunt and the cousin.  In addition, the judge considered DCF's adoption plan, which noted that Rahkeem was "well-bonded" to the aunt.  The adoption plan set forth several possible kinship

_____

[7] As stated, neither parent contests the judge's findings as to their unfitness.  Based on our review of the overwhelming evidence of domestic violence and its impact on Rahkeem, we would find no merit to any such claims.  See Adoption of Jacob, 99 Mass. App. Ct. 258, 264-265 (2021).  See also Custody of Vaughn, 422 Mass. 590, 599 (1996).

placements -- which did not include the aunt or the cousin -- and the alternative of recruitment of a preadoptive foster home.[8]

The judge found that the aunt "loves" Rahkeem, but credited DCF's concern that the aunt and the cousin were unable to keep Rahkeem safe. Crediting the testimony of the ongoing social worker, the judge found that the aunt was not a suitable placement because "[i]t was [the aunt]'s decision to allow Mother and [Father] to have unsupervised contact with [Rahkeem], which led to the injury of the child," and the aunt was easily manipulated by the parents. In addition, the judge found not credible the aunt's testimony that she had followed the recommendations of an early intervention worker to help Rahkeem overcome his delays in speech and gross motor skills. The judge concluded that placement of Rahkeem with the aunt and the cousin would not be in the child's best interests because it "would expose [Rahkeem] to the parents['] untreated substance abuse and ongoing domestic violence." We discern no abuse of discretion in the judge's determination that the aunt and the cousin were not a suitable placement based on those findings of fact.

---

[8] The judge concluded that the adoption plan was sufficiently developed, and we concur. See Adoption of Paula, 420 Mass. 716, 722 n.7 (1995); Adoption of Gertrude, 99 Mass. App. Ct. 817, 823 (2021).

The mother argues that the judge abused her discretion by declining to order posttermination or postadoption visitation between Rahkeem and the aunt and the cousin. "A 'judge who finds parental unfitness to be established has broad discretion to determine what is in a child's best interests with respect to custody and visitation with biological family members thereafter.'" Adoption of Ursa, 103 Mass. App. Ct. 558, 571 (2023), quoting Adoption of Rico, 453 Mass. 749, 756 (2009) (rejecting mother's argument that judge should have ordered visitation between children and grandmother). We discern no such abuse of discretion.

b. Best interests of the child. The father argues that the judge erred in terminating his parental rights to Rahkeem, contending that the findings as to the best interests of the child were "legally insufficient." The father does not contest the accuracy of the findings that the judge did make concerning the parents' unfitness and the best interests of the child. Rather, the father argues that the judge's findings were clearly erroneous because they ignored evidence of the feasibility of placing Rahkeem with the aunt, which would not have required termination of the father's parental rights. We are not persuaded. As discussed above, the judge did not abuse her discretion in concluding that the aunt was not a suitable

14

placement because she was unable to keep Rahkeem safe from harm that occurred during unsupervised contact with the father. For the same reason, the judge did not abuse her discretion in concluding that termination of the father's parental rights was in the best interests of the child. See Adoption of Nancy, 443 Mass. 512, 519 (2005).

2. Motion for a new trial. a. Rights to counsel of aunt and cousin. The mother argues that the judge should have granted her a new trial, contending that the rights to counsel of the aunt and cousin were violated at the emergency custody hearing and at the portions of trial at which the judge considered whether to place Rahkeem in their custody. The mother points to G. L. c. 119, § 29, which provides that at all hearings in child custody proceedings to which DCF is a party, "the parent, guardian or custodian of the child . . . shall have and be informed of the right to counsel" (emphasis added).[9] The mother also relies on Care & Protection of Manuel, 428 Mass. 527, 530 (1998), which noted that a District Court judge had appointed counsel for a temporary custodian at an emergency custody hearing. But "allusions to the discretionary decision

_____

[9] Of course, as mentioned above, see note 6, supra, as of the emergency custody hearing, the cousin had not been Rahkeem's custodian for more than one year.

15

of a single trial judge do not amount to a rule" requiring such appointment.  Adoption of Jacob, 99 Mass. App. Ct. 258, 270 n.16 (2021) (trial judge's discretionary decision to permit guardianship petitioners full access to care and protection proceedings did not amount to rule requiring access in all cases).

The mother waived this argument by failing to raise it at trial.  See Adoption of Ursa, 103 Mass. App. Ct. at 570. Indeed, at the emergency custody hearing, the mother's position conflicted with a return of custody to the aunt.  When counsel for DCF informed the judge that social workers involved in the emergency removal were present and ready to testify, the judge asked for the position of the mother, who was present, and her counsel stated that the mother "would like to go forward with the trial . . . to get custody returned to her."[10]  The mother never argued at trial that the aunt or the cousin had a statutory right to counsel, and so she waived the issue.[11]  Cf.

_____

[10] Asked for the position of the father, who was not present, his counsel replied that as of the previous hearing, the father's position "was that the child should be in the custody of the Mother or else in the custody of [the aunt]." Two days later, when the father moved to place Rahkeem in the custody of the aunt and cousin, the mother now took the position that she was "fully supportive" of the father's motion.  At trial the mother asked for Rahkeem to be placed with the aunt.

[11] We do not reach DCF's argument that the disjunctive "or" in G. L. c. 119, § 29, should be read to mean that only one of

16

<u>Adoption of Jacob</u>, 99 Mass. App. Ct. at 266 n.11 (noting that mother and child both stated at trial that grandparents should not be present during care and protection proceedings but argued converse on appeal).

b. <u>Sibling visitation</u>. The judge ordered that Rahkeem "shall continue to have regular visitation with his siblings, Angela and Sam, within the parameters established by [Filippo] and [DCF]." The mother contends that the judge should have allowed her motion for a new trial to the extent that it sought mandatory sibling visitation between Rahkeem and his three maternal half-siblings, Jillian, Sam, and Angela.

Putting aside the question whether the mother continued to have standing to seek sibling visitation on Rahkeem's behalf once her parental rights were terminated, see <u>Adoption of Franklin</u>, 99 Mass. App. Ct. 787, 803-805 (2021), we discern no abuse of discretion in the judge's ruling that Rahkeem's continued regular visitation with Angela and Sam was to take place "within the parameters established by [Filippo] and [DCF]." The judge properly left such issues as the frequency and duration of sibling visits to the children's legal custodians. See G. L. c. 119, § 26B (<u>b</u>). See also <u>Adoption of</u>

the three categories of caretaker -- parent, guardian, or custodian – in any given case is entitled to counsel.

17

Garret, 92 Mass. App. Ct. 664, 680-681 (2018).  The judge was not required to dictate the terms of those visits, particularly because she heard and credited evidence that the mother had not only manipulated the aunt into giving her unsupervised access to Rahkeem, but also manipulated family members into giving her access to Angela and Sam, who did not want to see her.[12]

c.  Disrupted placement.  The mother contends, as she asserted at argument on the motion for a new trial, that the decree adopting DCF's permanency plan was no longer "equitable" because of the recent disruption of a kinship placement of Rahkeem.  The judge heard the arguments of counsel as to the reasons why the kinship placement was unsuccessful, and by denying the motion for a new trial rejected the mother's argument.  We discern no abuse of discretion in the judge's implicit ruling that the unsuccessful kinship placement did not undermine the grounds supporting the decree.  Cf. Adoption of Cesar, 67 Mass. App. Ct. 708, 712-713 (2006) (mother's significant improvements after trial did not render finding of

---

[12] The judge noted that in October 2020 the mother persuaded the aunt to arrange a supposedly coincidental encounter between the mother and Angela, who did not want to see the mother, and that the mother arranged a similar encounter with Sam using the maternal grandmother as a go-between.  The mother admitted at trial that she arranged those encounters and that she did not regret doing so, which the judge found, evidenced the mother's placing her own needs above those of her children and her continued lack of insight into their feelings.

unfitness stale).  But see Adoption of Franklin, 99 Mass. App. Ct. at 792-793, 806-807 (remanding for reconsideration of posttermination visitation between father and preteen child who wanted visits, where adoption placement with siblings had been disrupted due to child's mental illness and child had been in institutional care for almost two years).

Conclusion.  Accordingly, we affirm the decrees and the order denying the mother's posttrial motion.

So ordered.

By the Court (Henry, Grant & D'Angelo, JJ.[13]),

Assistant Clerk

Entered:  June 3, 2024.

---

[13] The panelists are listed in order of seniority.