******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## IN RE RILEY B.*
## (SC 20613)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The proposed intervenor, J, filed a motion to intervene subsequent to the
termination of her parental rights with respect to her minor child, R,
in an effort to obtain a posttermination order of visitation with R. J's
parental rights had been terminated on the grounds that she failed to
achieve a sufficient degree of personal rehabilitation, as required by
the applicable statute (§ 17a-112), and that termination was in R's best
interest. During the termination proceedings, J did not request visitation
with R in the event that her parental rights were terminated. J appealed
from the judgment terminating her parental rights but did not request
a stay of execution of that judgment pending appeal. More than six
months after that appeal had been filed, J filed a motion for visitation,
which the trial court denied, concluding that it did not have authority
to order visitation after her parental rights were terminated and that,
even if it had such authority, there was no basis for granting visitation
under the circumstances. The trial court dismissed her subsequent
motion to intervene on grounds of res judicata in light of its decision
on her motion for visitation. After the dismissal of J's motion to intervene,
the Appellate Court affirmed the judgment terminating J's parental
rights. On appeal from the trial court's dismissal of J's motion to inter-
vene, *held* that J's appeal was dismissed for lack of subject matter
jurisdiction, J having had no colorable claim to intervention in R's juve-
nile case as a matter of right: following the termination of her parental
rights, J lacked a direct and substantial interest in the subject matter
of R's juvenile case to warrant intervention as of right, notwithstanding
any emotional bond between J and R, and, therefore, J failed to establish
the party status necessary to support this court's jurisdiction to consider
her appeal from the dismissal of her motion to intervene; moreover,
insofar as J claimed that, as R's biological mother, she was an appropriate
person to represent R's interests, that claim ignored both the legal
and factual implications of the termination of J's parental rights, as J's
parental rights were terminated because there was clear and convincing
evidence that she was unable or unwilling to put R's best interests ahead
of her own and that there was no reasonable prospect that that fact
would change in the near future, and, accordingly, J was in no position
to claim a right to represent R's best interests.

Argued November 18, 2021—officially released March 2, 2022**

*Procedural History*

Petition by the Commissioner of Children and Fami-
lies to terminate the respondents' parental rights with
respect to their minor child, brought to the Superior
Court in the judicial district of New Haven, Juvenile
Matters, and tried to the court, *Marcus, J.*; judgment
terminating the respondents' parental rights, from
which the respondent mother appealed to the Appellate
Court; thereafter, the court, *Marcus, J.*, denied the
respondent mother's motion for posttermination visita-
tion; subsequently, the court, *Marcus, J.*, dismissed the
respondent mother's motion to intervene, and the
respondent mother appealed to the Appellate Court;
thereafter, the Appellate Court, *Alvord, Moll* and *DiPen-
tima, Js.*, affirmed the trial court's judgment terminat-
ing the respondents' parental rights; subsequently, the
respondent mother's appeal from the trial court's dis-

missal of the motion to intervene was transferred to this court. *Appeal dismissed.*

*Albert J. Oneto IV*, assigned counsel, for the appellant (proposed intervenor).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Sara Nadim*, assistant attorney general, for the appellee (petitioner).

*Margaret Doherty* filed a brief for the Connecticut Alliance of Foster and Adoptive Familes as amicus curiae.

*Opinion*

KELLER, J. In *In re Ava W.*, 336 Conn. 545, 248 A.3d 675 (2020), this court held that, if a parent requests posttermination visitation in the course of the proceeding adjudicating the petition for termination of parental rights, the trial court has jurisdiction over such a request and the authority to grant posttermination visitation under appropriate circumstances. See id., 548–49. This court underscored that its decision was limited to this specific procedural posture and explicitly left open the question of whether a trial court has the authority to adjudicate a request for posttermination visitation filed *after* parental rights have been terminated. Id., 590 n.18. The present appeal arises under the circumstances on which we reserved judgment in *In re Ava W.*

The proposed intervenor, Jacquanita B., the biological mother of Riley B., appeals from the trial court's judgment dismissing her posttermination motion to intervene in Riley's juvenile case to obtain an order for visitation.[1] Jacquanita B. claims that the trial court incorrectly concluded that her motion to intervene was barred by res judicata in light of the court's denial of a previously filed postjudgment motion for posttermination visitation. We conclude that, posttermination, biological parents lack a legally cognizable interest to support a right to intervene in the juvenile case for the purpose of seeking visitation. Therefore, the appeal must be dismissed for lack of subject matter jurisdiction.

The record reveals the following facts, as found by the trial court in its decision terminating Jacquanita B.'s parental rights or that are otherwise reflected in the record, and procedural history. The Department of Children and Families (department) has a long history of involvement with Jacquanita B. and her three biological children—half siblings Nyasia, Corrynn, and Riley—due to mental health issues and a pattern of inflicting physical abuse as discipline. Although this history is not directly relevant to the issue in this appeal, it provides an important context for the legal principles on which we rely.

In 2013, when Jacquanita B.'s eldest child, Nyasia, was six or seven years old, she was removed from Jacquanita B.'s care and placed in her father's custody after evidence came to light that Jacquanita B. had repeatedly physically abused her. Jacquanita B.'s second born child, Corrynn, who was then only an infant, was unharmed at that time and remained in Jacquanita B.'s care.

The department became involved with the family again in 2018, when Corrynn was six or seven years old, after a school nurse reported that she had observed extensive bruising and welts on Corrynn's inner forearms. Corrynn stated that Jacquanita B. had struck her with a belt because she had forgotten to do her homework. Jacquanita B. denied the allegations and mini-

mized the nature of Corrynn's injuries but, eventually, was criminally charged with risk of injury to a child and assault in the second degree.

In June, 2018, following the report of the school nurse, the petitioner, the Commissioner of Children and Families (commissioner), filed a neglect petition as to Corrynn and Jacquanita B.'s youngest child, Riley, after Jacquanita B. repeatedly failed to meet conditions of a safety plan that would have allowed them to remain in her care. The department thereafter received reports that Jacquanita B. had been physically and verbally abusing Corrynn on a regular basis. Jacquanita B. repeatedly thwarted the department's efforts to visit the home to investigate. In July, 2018, after the New Haven police informed the department that Jacquanita B. had been arrested on charges relating to her assault of a neighbor with a crowbar, the department invoked a ninety-six hour hold and obtained an ex parte order of temporary custody of the children. Both children were taken for medical examinations, which revealed that Corrynn had numerous injuries in various stages of healing but that Riley appeared unharmed. In August, 2018, the trial court sustained the order of temporary custody of the children, after Jacquanita B. elected to contest the order but failed to appear for most of the hearing. The children were placed in a nonrelative foster home.

Two months after the children entered the department's care, by which time Riley was almost two years old, Riley was adjudicated neglected and committed to the commissioner's custody.[2] The trial court issued final specific steps for reunification. The department arranged for the provision of mental health and anger management services, but Jacquanita B. never participated and repeatedly asserted that she had never abused Corrynn or anyone else. Jacquanita B. attended weekly supervised visitation with Riley until August, 2018, at which time she ceased attending to evade arrest on a warrant that had been issued in connection with Corrynn's injuries.

In December, 2018, Jacquanita B. was located by the police and taken into custody. The department resumed Jacquanita B.'s supervised visitation with Riley once she was released on bond and continued to provide visitation after she began to serve a two year term of imprisonment in connection with the charges relating to the incidents involving Corrynn and the neighbor.

In 2019, the court approved the commissioner's permanency plan of termination of parental rights and adoption for Riley. The commissioner thereafter filed a petition seeking to terminate Jacquanita B.'s parental rights as to Riley on the ground of failure to rehabilitate.[3] While that petition was pending, Jacquanita B. filed a motion to open and modify the neglect disposition to transfer guardianship of Riley to a maternal relative who lived in New Jersey. The termination petition and

the motion to open and modify the disposition were heard together. During the proceedings, Jacquanita B. made no request for visitation with Riley in the event that her parental rights were terminated.

In January, 2020, the trial court issued a memorandum of decision in which it found that the commissioner proved by clear and convincing evidence that Jacquanita B. had failed to rehabilitate pursuant to General Statutes § 17a-112 (j) (3) (B) (i) and that termination of her parental rights was in Riley's best interest. The court cited, among other things, Jacquanita B.'s failure to address her mental health issues, to acknowledge her abuse of her other children, and to refrain from involvement with the criminal justice system. The court noted that it was barred from transferring guardianship of Riley to Jacquanita B.'s relative, despite the department's willingness to consider the relative as a potential adoptive resource, because the study mandated for an out-of-state placement under the Interstate Compact on the Placement of Children; see General Statutes § 17a-175; had not yet been completed.[4] The court rejected Jacquanita B.'s request to stay disposition of the case until the study was completed, finding that a stay would not be in Riley's best interest. It emphasized the importance of achieving permanency for Riley, even if placement with the New Jersey relative ultimately was not approved. The court acknowledged credible testimony that Riley had a bond with Jacquanita B., having lived with her for the first two years of her life, but found that there was no reasonable likelihood that giving Jacquanita B. more time would result in her bringing her performance as a parent within acceptable standards that would allow for reunification. The court therefore denied Jacquanita B.'s motion seeking to transfer guardianship, rendered judgment terminating her parental rights, and appointed the commissioner as Riley's statutory parent.

Jacquanita B. timely appealed from the judgment terminating her parental rights. She did not request a stay of the execution of the judgment pending appeal. See Practice Book § 61-12. In August, 2020, after that appeal had been pending for more than six months, Jacquanita B. filed a motion for posttermination visitation with Riley. In the motion, she alleged that the department had provided posttermination visitation until February, 2020, at which time the correctional facility where she was incarcerated stopped in person visits due to the COVID-19 pandemic. She further alleged that, following her release from that facility in July, 2020, the department did not resume visitation. She cited this court's recently released decision in *In re Ava W.* as support for the trial court's authority to issue a posttermination of parental rights visitation order and asserted that such an order should issue because visitation would be "in the best interests of the minor child." The commissioner opposed the motion, contending that the court lacked

authority to issue such an order and that, even if it had such authority, the basis on which visitation was sought—a generalized best interest of the child standard—was legally insufficient.

The trial court denied the motion for posttermination visitation. It concluded that *In re Ava W.* did not provide it authority to grant the motion because the holding in that case was limited to a request for posttermination visitation made in the course of the termination proceeding. The court further noted that, even if *In re Ava W.* provided authority for the court to order, postjudgment, posttermination visitation, there were neither allegations nor evidence to support the statutory ground on which this court in *In re Ava W.* relied to justify such an order, i.e., that visitation was "necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child . . . ." General Statutes § 46b-121 (b) (1); see *In re Ava W.*, supra, 336 Conn. 549. The court noted that Jacquanita B. had put her own needs ahead of Riley's needs and had not addressed the issues that resulted in the physical abuse of Riley's half siblings, which put Riley at risk if visits were to occur.

In October, 2020, approximately six weeks after the trial court denied her motion for posttermination visitation, Jacquanita B. filed a "Motion to Intervene Postjudgment and for an Order of Posttermination Visitation" (motion to intervene), in which she again cited *In re Ava W.* as authority for posttermination visitation but now asserted that the failure of the department and Riley's foster parents to ensure visitation was in contravention of Riley's "welfare, protection, proper care, and suitable support." In her accompanying memorandum of law, she asserted that she had standing to seek such an order by virtue of her status as Riley's natural parent, whose ongoing relationship with the child was necessary to secure the child's welfare. The motion was opposed by the commissioner, as well as by Riley's counsel. The trial court "dismissed" the motion to intervene on the ground of res judicata in light of the court's decision on the motion for posttermination visitation.[5] This appeal followed.[6]

Although the parties make several arguments on appeal, we limit our focus to those implicating subject matter jurisdiction, which ultimately is dispositive. Jacquanita B. contends that res judicata does not apply to her second request for posttermination visitation because the trial court lacked subject matter jurisdiction over her first request. Specifically, she contends that she lacked standing to file her motion for posttermination visitation in the absence of a properly filed motion to intervene and that, because this omission precluded her from being made a party to Riley's juvenile case in connection with the motion for posttermination visitation, the trial court lacked subject matter jurisdiction

to consider that motion.

The commissioner agrees with Jacquanita B. on one point—that the lack of a proper motion to intervene is a jurisdictional bar. The commissioner contends, however, that Jacquanita B. has no colorable claim to intervention as of right, and, therefore, her appeal must be dismissed due to the lack of subject matter jurisdiction. We agree with the commissioner.

Unless a specific right to appeal otherwise has been provided by statute, "[a] threshold inquiry of this court upon every appeal presented to it is the question of appellate jurisdiction. . . . It is well established that the subject matter jurisdiction of the Appellate Court and of this court is governed by [General Statutes] § 52-263, which provides that an aggrieved party may appeal to the court having jurisdiction from the final judgment of the court." (Citation omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *King* v. *Sultar*, 253 Conn. 429, 434, 754 A.2d 782 (2000).

When a motion to intervene is denied; see footnote 5 of this opinion; typically two elements of appellate jurisdiction are called into question: whether the movant properly can be viewed as a party to the underlying matter and whether denial of the motion is a final judgment. See *In re Santiago G.*, 325 Conn. 221, 228, 157 A.3d 60 (2017); *In re Brian P.*, 195 Conn. App. 582, 587, 226 A.3d 152 (2020); *In re Joshua S.*, 127 Conn. App. 723, 728, 14 A.3d 1076 (2011). Both elements are assessed under the same standard: "[I]f a would-be intervenor has a colorable claim to intervention as a matter of right . . . both the final judgment and party status prongs of our test for appellate jurisdiction are satisfied." (Citation omitted; internal quotation marks omitted.) *King* v. *Sultar*, supra, 253 Conn. 436.

The present case is atypical, however, because the trial court did not deny intervention on the ground that Jacquanita B. did not meet the requirements for intervention. Cf. *In re Santiago G.*, supra, 325 Conn. 225–26. It did not reach that issue because it concluded that consideration of her motion to intervene was barred by res judicata. A decision that a party's claim is barred by res judicata is deemed a final judgment under the second prong of *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983) (otherwise interlocutory order or ruling constitutes appealable final judgment when order or ruling "so concludes the rights of the parties that further proceedings cannot affect them"). See *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, 300 Conn. 325, 328 n.3, 15 A.3d 601 (2011). A denial of a motion to intervene on this basis does not, however, remove the party status jurisdictional impediment to appeal.

Therefore, we turn to the issue of whether Jacquanita B. has a colorable claim to intervention as of right. "In

order for a proposed intervenor to establish that [she] is entitled to intervene as a matter of right, the proposed intervenor must satisfy a well established four element conjunctive test: [T]he motion to intervene must be timely, the movant must have a direct and substantial interest in the subject matter of the litigation, the movant's interest must be impaired by disposition of the litigation without the movant's involvement and the movant's interest must not be represented adequately by any party to the litigation. . . . Failure to meet any one of the four elements . . . will preclude intervention as of right." (Citations omitted; footnote omitted; internal quotation marks omitted.) *BNY Western Trust* v. *Roman*, 295 Conn. 194, 205–206, 990 A.2d 853 (2010).

"A colorable claim is one that is superficially well founded but that may ultimately be deemed invalid . . . ." (Internal quotation marks omitted.) Id., 209. "[T]he [movant] need not convince the trial court that he necessarily will prevail; he must demonstrate simply that he might prevail." (Emphasis omitted; internal quotation marks omitted.) *In re Santiago G.*, supra, 325 Conn. 231. If the movant meets this threshold, the reviewing court has jurisdiction to consider whether the trial court properly denied the motion to intervene.[7] See id. Because the trial court did not determine whether Jacquanita B. met the requirements for intervention as of right, our review is plenary. See *Austin-Casares* v. *Safeco Ins. Co. of America*, 310 Conn. 640, 650, 81 A.3d 200 (2013) (review of claim of intervention as of right is plenary, except as to element of timeliness, which is reviewed for abuse of discretion).

A survey of jurisprudence addressing the effect of termination of parental rights yields the inexorable conclusion that, following the rendering of judgment terminating parental rights, a biological parent has no colorable right to intervene in the child's juvenile case to seek posttermination visitation. " 'Termination of parental rights' means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent . . . ." General Statutes § 17a-93 (5); accord General Statutes § 45a-707 (8). Severance of this legal relationship means that "the constitutional right to direct the child's upbringing, as well as the statutory right to visitation, no longer exists . . . ." (Internal quotation marks omitted.) *In re Ava W.*, supra, 336 Conn. 560. "In effect, the [biological parent] is a legal stranger to the child with no better claim to advance the best interests of the child than any remote stranger." (Emphasis omitted.) *In re Charles R.*, 1993 WL 7528, *1 (Conn. Super. January 8, 1993); see also *A.J.* v. *L.O.*, 697 A.2d 1189, 1191–92 (D.C. App. 1997) (termination of parental rights rendered parents legal strangers to their biological children); *In re Z.O.G.-I.*, 375 N.C. 858, 869, 851 S.E.2d 298 (2020) ("[t]ermination of parental rights . . . render[s] the child a legal stranger to the

biological parent" (internal quotation marks omitted)).

Once judgment terminating parental rights is rendered, the court is authorized to issue posttermination orders only to protect the child's interests, not the biological parents' interests. See General Statutes § 46b-121 (b) (1) ("[i]n juvenile matters, the Superior Court shall have authority to make and enforce such orders directed to parents . . . guardians, custodians or other adult persons owing some legal duty to a child therein, as the court deems necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child subject to the court's jurisdiction or otherwise committed to or in the custody of the [c]ommissioner"). Posttermination actions by the court, as well as those of the commissioner, as the child's statutory parent, are aimed at one goal—securing a permanent home for the child, preferably through adoption. See General Statutes § 17a-93 (6) (" '[s]tatutory parent' means the [commissioner] or that child-placing agency appointed by the court for the purpose of giving a minor child or minor children in adoption"); General Statutes § 17-112 (o) (charging court with periodic review, posttermination, of statutory parent's progress in implementing permanency plan and finalizing adoption); see also *In re Davonta V.*, 285 Conn. 483, 492, 940 A.2d 733 (2008); *In re Jonathan M.*, 255 Conn. 208, 232, 764 A.2d 739 (2001).

In *In re Ava W.*, this court emphasized the significance of the fact that the respondent mother was a party to the termination proceeding at the time she made her request for posttermination visitation: "[The respondent mother] has a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest shared by the community, because she was a party to the underlying litigation who requested that the trial court act pursuant to its common-law authority. She was not merely a participant in that litigation. . . . She was the respondent in a proceeding in which the [commissioner] sought to terminate her parental rights. In the course of that proceeding, she requested that the trial court permit and order posttermination visitation with her child."[8] (Citation omitted.) *In re Ava W.*, supra, 336 Conn. 555–56; cf. *In re Jason P.*, 41 Conn. Supp. 23, 30, 549 A.2d 286 (1988) (because termination of father's parental rights would foreclose his right to intervene in subsequent proceeding to terminate mother's parental rights, paternal grandmother could not intervene in that proceeding as of right). Because of her party status in the termination proceeding, the respondent mother had the opportunity to present evidence in that proceeding bearing on whether posttermination visitation would be "necessary or appropriate . . . ." General Statutes § 46b-121 (b) (1); see *In re Ava W.*, supra, 590 n.18.

The temporal distinction that this court alluded to in

*In re Ava W.* has been explicitly recognized by several other jurisdictions. They have concluded that the court's ability to adjudicate a biological parent's request for posttermination visitation ceases following the rendering of judgment terminating parental rights. Some jurisdictions have reached this conclusion on the basis of the biological parent's lack of standing.[9] Other jurisdictions have cast this issue in terms of the trial court's lack of authority to order postjudgment, posttermination visitation in the absence of a specific statutory grant of authority.[10]

Ignoring this uniform authority rejecting a biological parent's right to be heard on a request for posttermination visitation, Jacquanita B. contends that this court's decisions in *In re Ava W.* and *Michaud* v. *Wawruck*, 209 Conn. 407, 551 A.2d 738 (1988), support a contrary conclusion. She suggests that this court in *In re Ava W.* recognized a parent's "common-law right" to posttermination visitation and asserts that it is this interest that she seeks to vindicate through her motion to intervene. Jacquanita B. misreads that decision. In *In re Ava W.*, this court clearly referred to § 46b-121 (b) (1) as a codification of the *trial court's* common-law authority to issue orders for posttermination visitation to protect the *child's* interests. See *In re Ava W.*, supra, 336 Conn. 577. This court previously has noted that, "[a]t common law, grandparents, or third parties in general, have no right to visitation." *Castagno* v. *Wholean*, 239 Conn. 336, 340, 684 A.2d 1181 (1996), overruled in part on other grounds by *Roth* v. *Weston*, 259 Conn. 202, 789 A.2d 431 (2002). Whether the *trial court's common-law authority* to order posttermination visitation extends postjudgment was not addressed by this court in *In re Ava W.*; however, regardless of whether it would so extend, such authority would not give rise to a biological parent's common-law right to posttermination visitation.

Jacquanita B. also misinterprets this court's decision in *Michaud*. She reads that case to stand for the proposition that a judgment terminating parental rights does not affect the biological parent's ability to invoke the power of the Superior Court in equity, posttermination, to issue orders of visitation with her child. *Michaud* stands for no such proposition. In *Michaud*, a written agreement for visitation had been executed by the child's then foster parents, who were seeking to adopt the child, after the biological mother filed a motion to set aside the judgment terminating her parental rights. See *Michaud* v. *Wawruck*, supra, 209 Conn. 408–409. The biological mother agreed to withdraw her action and to allow the adoption to go forward in exchange for the foster parents' agreement to permit regular visitation postadoption. See id., 409. After the adoption was finalized, the adoptive parents terminated all visitation. See id., 409–10. The biological mother brought an action seeking enforcement of the agreement. See id., 408. The

sole issue before this court in *Michaud* was "whether a written visitation agreement between a [biological] mother and adoptive parents violates the public policy of this state." Id. This court concluded that "the statutory creation of an adoptive family does not automatically require complete severance of the child from all further contact with former relatives" and that, "as long as the best interest of the child is the determinative criterion, public policy does not forbid an agreement about visitation rights between a [biological] parent and adoptive parents." Id., 415. Thus, *Michaud,* as a contract case between private parties, is procedurally and substantively distinguishable from the present case.[11] Moreover, the statutory provisions that the legislature subsequently enacted to regulate cooperative postadoption agreements regarding contact with biological parents further underscore the temporal line of demarcation embodied in the authorities previously discussed. See General Statutes § 17a-112 (b) (2) (permitting parties to enter into cooperative postadoption agreements if order has not yet been entered terminating parental rights); General Statutes § 17a-112 (f) (requiring court to include order approving cooperative postadoption agreement in final order terminating parental rights).

The foregoing principles and authorities make it apparent that Jacquanita B. has no colorable claim to intervention as of right in Riley's juvenile case. Although the commissioner has argued that Jacquanita B. cannot satisfy any element of the test for intervention as of right, it suffices to conclude that, as to the second element, she lacks "a direct and substantial interest in the subject matter of the litigation . . . ." (Internal quotation marks omitted.) *BNY Western Trust* v. *Roman,* supra, 295 Conn. 205. Whatever emotional bond that may continue to exist between Jacquanita B. and Riley does not give rise to a direct and substantial interest in Riley's juvenile case. See *In re Joshua S.*, supra, 127 Conn. App. 729–30 (concluding that foster parents did not have colorable claim to intervention as of right and, thus, were not parties entitled to appeal because, "[a]lthough the [trial] court's determination regarding the guardianship of [the child] likely affected the foster parents emotionally, it did not affect any direct or personal rights held by them as a matter of law"); *In re Kristy L.*, 47 Conn. Supp. 273, 289–90, 787 A.2d 679 (1999) (concluding that paternal grandparents had legally insufficient interest to intervene in juvenile case to seek custody or visitation of grandchild after termination of parents' parental rights); see also *In re Santiago G.*, supra, 325 Conn. 234 ("the termination of [the biological mother's] parental rights will not cause [the proposed intervenor] irreparable harm or abrogate a right that she currently holds because, even assuming that [she] does have some guardianship interest over [the child], the . . . termination proceeding would in no way affect that interest").

To the extent that Jacquanita B. suggests that she is an appropriate person to represent Riley's interests because she is Riley's biological mother, that argument ignores not only the legal, but also the factual, implications of termination of parental rights. As the trial court's findings in the termination proceedings in the present case plainly demonstrate, when termination of parental rights is deemed the proper disposition, there is clear and convincing evidence that the biological parent is unable and/or unwilling to put her child's best interests ahead of her own and that there is no reasonable prospect that this fact will change in the near term. In this context, the biological parent is in no position to claim the right to represent the child's best interests.[12]

Although we do not discount the possibility that there may be situations in which the provision, postjudgment, of posttermination visitation could be appropriate, the commissioner, or any other statutory parent, is charged with protecting the child's interests and overseeing the child's care until an adoption or other permanent placement is secured.[13] See General Statutes § 45a-718 (b) ("[t]he statutory parent shall be the guardian of the person of the child, shall be responsible for the welfare of the child and the protection of the child's interests and shall retain custody of the child until the child attains the age of eighteen unless, before that time, the child is legally adopted"); see also *Nye* v. *Marcus*, 198 Conn. 138, 142, 145, 502 A.2d 869 (1985) (rejecting argument that foster parents who sought to contest return of custody to parent had standing "derivatively . . . to assert the interests of their foster child because of the nature of their relationship with the child and because to deny them standing effectively eliminates the child's ability to assert her own interest," holding that "[i]t is clear that the legislature intended that [the commissioner] safeguard [the child's] best interests regarding custody"). The commissioner could assess any benefit to be gained from visitation in light of the child's emotional needs and paramount interest in permanency, and determine, eventually, whether it would be feasible and would not unreasonably interfere with the child's permanent placement.[14]

We conclude that Jacquanita B. lacks a colorable claim of a direct and substantial interest in the subject matter of the litigation that would warrant intervention as of right. She therefore has failed to establish the party status necessary to support this court's jurisdiction to consider her appeal from the trial court's dismissal of her motion to intervene.

The appeal is dismissed.

In this opinion the other justices concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open

for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** March 2, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Jacquanita B. appealed from the trial court's dismissal of her motion to intervene to the Appellate Court. Following oral argument to that court, in which the parties debated the question on which this court had expressly reserved judgment in *In re Ava W.*, the Appellate Court recommended transfer of the appeal to this court pursuant to Practice Book § 65-2, and we thereafter transferred the appeal to this court.

[2] By the time proceedings ensued for termination of Jacquanita B.'s parental rights as to Riley, Corrynn had been adjudicated abused, and her approved permanency plan was for her to be reunified with her father.

[3] The commissioner simultaneously sought to terminate the parental rights of Riley's father due to abandonment and other grounds. The trial court granted the petition as to the father and rendered judgment terminating his parental rights. He did not appeal from the judgment.

[4] The court noted that, while the study was in process, the department had been transporting Riley to New Jersey for monthly visitation with this relative.

[5] "[T]he doctrine of res judicata, or claim preclusion, [provides that] a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action [between the same parties or those in privity with them] on the same claim." (Internal quotation marks omitted.) *Girolametti* v. *Michael Horton Associates, Inc.*, 332 Conn. 67, 75, 208 A.3d 1223 (2019). Although the trial court purported to dismiss Jacquanita B.'s motion to intervene on the basis of res judicata, that doctrine is not jurisdictional in nature, and, therefore, the motion should have been denied. See *Labbe* v. *Pension Commission*, 229 Conn. 801, 816, 643 A.2d 1268 (1994); *Zizka* v. *Water Pollution Control Authority*, 195 Conn. 682, 687, 490 A.2d 509 (1985).

[6] In the intervening period between the filing of Jacquanita B.'s appeal from the dismissal of her motion to intervene and oral argument before the Appellate Court in connection with that appeal; see footnote 1 of this opinion; the Appellate Court affirmed the judgment terminating Jacquanita B.'s parental rights. See *In re Riley B.*, 203 Conn. App. 627, 628–29, 248 A.3d 756 (concluding that record was inadequate to review respondent mother's claim that trial court deprived her of substantive due process by terminating her parental rights before parties learned whether guardianship could be transferred to maternal relative), cert. denied, 336 Conn. 943, 250 A.3d 40 (2021).

[7] In the typical case, if the movant makes a colorable claim to intervention as of right, the reviewing court "has jurisdiction to adjudicate both [the movant's] claim to intervention as a matter of right and to permissive intervention." (Internal quotation marks omitted.) *BNY Western Trust* v. *Roman*, supra, 295 Conn. 204; see also *In re Santiago G.*, supra, 325 Conn. 231 ("[i]t is only after we have addressed the jurisdictional threshold inquiry of whether the intervenor has a colorable claim of right to intervention that we turn to the second part of the inquiry of whether the trial court's judgment as to the motion to intervene was proper, namely, the merits of the intervenor's claim to intervene as of right or permissively"). As we previously indicated, however, in the present case, the trial court never reached the issue of whether Jacquanita B. was entitled to intervention as of right or to permissive intervention. If we were to conclude that Jacquanita B. had a colorable claim to intervention as of right, we would then review the trial court's determination that the doctrine of res judicata barred adjudication of the motion to intervene. If Jacquanita B. prevailed on her claim that res judicata was inapplicable, we would need to remand the case to the trial court to determine in the first instance whether Jacquanita B. established the elements for intervention as of right or permissive intervention, unless we were to request supplemental briefing on the issue of whether intervention would be improper as a matter of law. See *Austin-Casares* v. *Safeco Ins. Co. of America*, 310 Conn. 640, 652–53, 664, 81 A.3d 200 (2013) (concluding that, although plenary review applies to three elements of intervention as of right, timeliness element is reviewed for abuse of discretion, and abuse of discretion applies to ruling on permissive intervention).

[8] The court in *In re Ava W.* made this point in connection with its analysis of appellate aggrievement. See *In re Ava W.*, supra, 336 Conn. 555.

[9] See, e.g., *In re Adoption of Douglas*, 473 Mass. 1024, 1025–26, 45 N.E.3d 595 (2016) ("Until parental rights have been terminated by entry of a decree, parents have the right to participate in proceedings to determine issues

such as placement and visitation arrangements concerning their children. . . . It is only after a decree enters terminating parental rights . . . [that] the parent whose rights have been terminated is without standing to determine the child's future . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.)); *In re Adoption of Rico*, 453 Mass. 749, 758 n.16, 905 N.E.2d 552 (2009) (emphasizing significance of fact that order addressing father's request for visitation was issued in decision that "was part of the adjudication of a termination proceeding to which the father was a party"); *In re Interest of Ditter*, 212 Neb. 855, 856–57, 859, 326 N.W.2d 675 (1982) (concluding that, after parental rights of father had been terminated, paternal grandparents lacked standing to request visitation rights because they can have no greater rights than those of father); *In re Stacey D.*, 12 Neb. App. 707, 718, 684 N.W.2d 594 (2004) (concluding that, "once [the biological mother's] parental rights are terminated, she has no standing to assert entitlement to continued visitation with [her children]," unless "such request is made prior to the actual termination"); see also *In Interest of J.P.*, 499 N.W.2d 334, 340 (Iowa App. 1993) (concluding that biological parent "has no enforceable right to visitation with her children once her parental rights are terminated").

[10] See, e.g., *In re Noreen G.*, 181 Cal. App. 4th 1359, 1391, 105 Cal. Rptr. 3d 521 ("The parent-child relationship enjoys no legal recognition after termination of parental rights. . . . Thus, nothing in [the governing statutory scheme] requires the court to address postadoption visitation when terminating parental rights under [the applicable provision], and the court has no authority to essentially modify a termination order by granting visitation to the parent." (Citation omitted.)), review denied, California Supreme Court, Docket No. S180958 (April 22, 2010); *In re Elizabeth D.*, 888 A.2d 281, 282–83 (Me. 2006) (concluding that, although "an order terminating parental rights deprives the court of any authority to impose a condition that preserves contact between the parent and the child," court had authority to grant visitation pending appeal of judgment terminating parental rights, if court stayed judgment (internal quotation marks omitted)); *Division of Youth & Family Services* v. *B.G.S.*, 291 N.J. Super. 582, 594–96, 677 A.2d 1170 (App. Div. 1996) (authority to allow posttermination visitation rests exclusively with state child protection agency); *In re R.J.A.H.*, 101 S.W.3d 762, 764 n.1 (Tex. App. 2003) ("we are unaware of any authority that gives a trial court the power to grant a parent visitation rights to the child after their parental rights have been terminated"); see also *C.W.* v. *State*, 23 P.3d 52, 57–58 (Alaska 2001) ("[W]hen adequate grounds for termination exist, there is no presumption that the parent should have visitation rights. After parental rights have been fully terminated, the former parent has no residual rights at all—certainly the [applicable] statute provides for none. Because the . . . statute does not expressly provide for [posttermination] visitation by biological parents, courts probably lack authority to order [posttermination] visitation." (Footnote omitted.)).

[11] Jacquanita B. also suggests that intervention is appropriate because, according to her, our case law demonstrates that she alternatively could have initiated an independent action to seek visitation. Insofar as Jacquanita B. principally relies on *In re Jonathan M.*, supra, 255 Conn. 208, for this proposition, she ignores the fact that this court held in that case that the biological father had standing to file a petition for a writ of habeas corpus alleging ineffective assistance of counsel because he ultimately was challenging the termination of his parental rights. Id., 223–24. Although this court also stated in that case that a habeas petition could be used to challenge custody and visitation orders; see id., 223; the case law discussed involved biological parents whose parental rights had not been terminated. See id., 220; see also *Doe* v. *Doe*, 163 Conn. 340, 341, 345, 307 A.2d 166 (1972) (holding that person who had lived with child and mother lacked standing to bring habeas action to obtain custody and visitation because only parents or legal guardians of child have standing to seek such relief). The legislature later conferred statutory standing on foster parents and permitted adoptive parents to petition for a writ of habeas corpus regarding the custody of a child currently or recently in their care for a specified continuous period. See General Statutes § 52-466 (f). Notably, it did not confer such standing on parents whose parental rights had been terminated.

We are mindful that this court in *Michaud* indicated that the biological mother whose parental rights had been terminated could have obtained visitation with the child by filing a petition for right of visitation under General Statutes § 46b-59 and demonstrating that visitation was in the child's best interest. See *Michaud* v. *Wawruck*, 209 Conn. 414. Subsequent to this court's decision in *Michaud*, however, we placed a significant judicial gloss on that statute. See *Roth* v. *Weston*, supra, 259 Conn. 234–35. Section 46b-

59 now requires the petitioner to establish, by clear and convincing evidence, that he or she has a parent-like relationship with the child and that the child will suffer real and substantial harm in the absence of visitation. See id. The rights of a biological parent to seek posttermination visitation under § 46b-59 is not at issue in the present case, and, consequently, that statute does not inform our analysis here.

[12] In an appeal that was heard on the same day as the present appeal, this court was asked to clarify the nature of proof required to meet the statutory standard under § 46b-121 (b) (1) in cases of posttermination visitation, when sought in termination of parental rights proceedings. See *In re Annessa J.*, Connecticut Supreme Court, Docket No. SC 20614 (appeal filed September 17, 2021).

[13] We also note that the statutory scheme provides an opportunity for children to participate in the development of their permanency plan—directly, if older, or through an appointed representative, attorney, or guardian ad litem, if younger. See General Statutes § 46b-129 (k) (1) (B) (i) and (5).

[14] The Connecticut Alliance of Foster and Adoptive Families filed an amicus brief in which it suggested that foster and adoptive parents are best situated to assist the child in reconnecting with biological family members, where appropriate. It asks this court to hold that a biological parent has no standing, postjudgment, to seek posttermination visitation. We note that nothing in this opinion prevents foster families from facilitating such connections and recognize that, when relatives of the biological parents become a resource for the permanent placement of the child, there often may be continued, informally arranged contact between the child and the biological parents.