NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

23-P-294                                          Appeals Court

ADOPTION OF FLAVIA (and a companion case[1]).

No. 23-P-294.

Essex.     October 13, 2023. – April 4, 2024.

Present:  Wolohojian, Desmond, & Sacks, JJ.

Adoption, Care and protection, Dispensing with parent's consent to adoption, Visitation rights. Minor, Adoption, Care and protection, Visitation rights. Parent and Child, Care and protection of minor, Adoption, Dispensing with parent's consent to adoption. Practice, Civil, Care and protection proceeding, Findings by judge. Statute, Construction.

Petitions filed in the Essex County Division of the Juvenile Court Department on September 16, 2019.

The cases were heard by Karen E. Hennessy, J., and motions for visitation and for reconsideration were considered by her.

Laura E. Openshaw for the mother.
Laura M. Chrismer for Flavia & another.
Debra P. Dow for the father.
Laura L. Bouliane, Committee for Public Counsel Services, for Mark.
Carol Frisoli for Department of Children and Families.

---

[1] Adoption of Helen. The children's names are pseudonyms.

DESMOND, J.  In this consolidated appeal, we affirm Juvenile Court decrees terminating the mother's and the father's parental rights to their twin daughters, Flavia and Helen, but we vacate an order denying postdecree motions filed by the twins and their older half-brother, Mark (a pseudonym).  The motions cited G. L. c. 119, § 26B (b), and requested an order for sibling visitation.[2]  Because we conclude that an order should have entered, we remand the matter for further proceedings.

Background.  1.  Facts.  The Department of Children and Families (department) became involved with the family in 2014, after the mother committed an assault and battery on Mark, then five years old.  Diagnosed with trauma and a variety of behavioral and emotional disorders, Mark "require[d] a high level of care and supervision" to manage behaviors such as fire setting, self-harm, and aggressiveness toward animals; behaviors that the judge found resulted from the way the parents cared for Mark and increased after the twins' birth in 2015.[3]  In 2016, Mark was placed in a residential treatment center (residential center) due to his inability to be safe in a less restrictive

_____

[2] Our use herein of the word "visitation" is not meant to exclude virtual contact, which the children also sought.

[3] We refer to the father of Flavia and Helen as "the father" throughout our decision.  Although the father is not Mark's biological father, he is the only father figure that Mark has known.  Mark's biological father stipulated to the termination of his parental rights.

setting, and the department filed a care and protection petition on his behalf pursuant to G. L. c. 119, § 24. At the residential center, Mark continued to struggle with emotional regulation, impulsivity, lack of personal boundaries, and enuresis. In 2017, Mark was committed to the department's custody. In February 2019, the department transitioned him home to live with the parents and the twins.

Seven reports in as many months were then filed with the department pursuant to G. L. c. 119, § 51A (51A report), alleging neglect of all three children due to the parents' substance use and failure to engage with services for Mark. On investigation pursuant to G. L. c. 119, § 51B, the department learned that the parents had not followed recommendations for managing Mark's behaviors at home, such as establishing rules and consequences and implementing behavior charts. Instead, without consulting a doctor, the mother gave Mark a "vape pen" containing cannabidiol oil and had Mark smoke it "to help with his behaviors." Then twenty-nine years old, the mother reported poor liver function and regularly drank beer during meetings with in-home support workers, but she denied alcohol use, while the father, then thirty-one years old and addicted to Adderall after being prescribed it in 2016 for a childhood diagnosis of attention deficit hyperactivity disorder (ADHD), said in June 2019 that he bought Adderall "off the street and used it . . . ,

as it helped with his ADHD," but in July, he "denied any medications or diagnosis."

In September 2019, the mother reported that the father relapsed, and the department also learned that the parents had failed to seek immediate medical attention for Mark's broken arm after Mark hit a moving car while riding his scooter near a busy road. All three children were removed from the home, and the department filed a second petition pursuant to G. L. c. 119, § 24, this one naming Flavia and Helen. The petitions were consolidated, and by the time of trial, eleven year old Mark was living at the residential center where he had lived for periods totaling over five years. Flavia and Helen were six years old and living in the same foster home where they had been for two years, with a family that was prepared to adopt them. Both twins suffered from enuresis not caused by physical concerns, were diagnosed with unspecified trauma and stressor-related disorders, and received weekly therapy. Helen was additionally diagnosed with posttraumatic stress disorder with dissociative features and had developmental delays and emotional disabilities that "require[d] significant interventions."

2. <u>Trial</u>. Trial took place on thirteen nonconsecutive days between May of 2021 and 2022. On the eighth day, before the department introduced documentary evidence, the father moved for a directed verdict as to the twins. In response, the

department reported that it had no more witnesses because the foster mother was not available that day to testify about each twin's functioning and needs. A discussion ensued wherein the judge questioned the sufficiency of the evidence as to Flavia and Helen. The judge made the following comments: "I need more than what I have to make a determination," and "I need to know more about the girls' functioning. That's what I'm telling you." She asked whether the department would introduce reports for each twin that she knew had been, or were being, prepared, and she said, "[T]here's a bunch of information in [the reports] that I feel that I need in order to make a determination for these girls." The judge concluded that portion of the discussion by stating, "I leave it to you to conference how the evidence is going to get in. . . . [P]erhaps, the [d]epartment is going to call, like, the foster parent."

Later, the judge suggested that counsel for the parents and children "have a conversation" about their permanency plans -- all three children returning home -- in light of testimony that, the judge said, "raised real concerns for me about the legal viability" of that plan. A social worker had testified that Mark struggled at the residential center "with sexualized behaviors, impulsivity, limit setting, following directions, and respecting personal boundaries." The judge commented, "[I]f I credit that testimony . . . it creates a difficult situation

wherein, if [Mark] goes home, the girls can't go home; or if the girls go home, [Mark] can't go home."

The evidence closed in March 2022, after the foster mother testified and after Mark's twelfth birthday. Two months later, in court, the judge announced her decisions regarding the parents' fitness and each child's best interests without mentioning posttermination or postadoption visitation, for the parents or for Mark, with the twins. All three children were adjudged in need of care and protection and committed to the department's custody. The parents were found unfit, but termination of the mother's rights was not found to be in Mark's best interests, "given his strong position against adoption" and high level of need. See G. L. c. 210, § 2 (child's written consent to adoption required if child is "above the age of twelve").

As to Flavia and Helen, the judge expressed her view that "[f]or [Mark] to have any future, it's going to mean that the parents have to pour all of their attention towards reunification with him" and give him "all of the family's efforts," leaving an inadequate amount of time and attention for what she described as each twin's "significant needs as a result of the ongoing issues in regards to the parents' fitness." Although she "recognize[d] that there ha[d] been some progress" by the parents in addressing their "ongoing issues," the judge

considered that "when [she] reviewed the record, it was replete with instances of obfuscation and deception"; the father relapsed during trial; and there was a risk that the parents had not really changed  After "po[ring] over" the exhibits, listening to the testimony, and reviewing her notes, the judge made "a very, very difficult decision" that freeing Flavia and Helen for adoption by their foster parents was in each twin's best interests.  Decrees entered accordingly.  See G. L. c. 119, § 26 (b) (4); G. L. c. 210, § 3.  As to Mark, a judgment entered committing him to the department's permanent custody, and his placement in the residential center continued, see G. L. c. 119, § 26 (b) (2) (iii) -- a judgment from which neither he nor the mother appealed.

3.  Appeals and postdecree motions.  One week after the decrees entered, the parents and the twins filed a joint notice of appeal from the decrees.  On the same day, the parents and the twins also filed a "joint motion for orders regarding post-termination and post-adoption contact," seeking specific orders for posttermination and postadoption visitation, for the parents and for Mark, with the twins.  The judge did not expressly discuss the joint motion for visitation in her September 2022 findings of fact, conclusions of law, and rationale, wherein she expanded on her reasoning after trial in 450 findings of fact and forty conclusions of law.  The judge provided for parent-

child visitation with the twins to be "held at the discretion of the [d]epartment and then the adoptive parents, who will determine the frequency, length, location, and manner of such visitation," and sibling visitation between the twins and Mark "as often as the adoptive resource is able to accommodate" until after adoption, at which time "sibling visitation will be left to the sound discretion of the adoptive parents."

The following month, the judge allowed the mother's request for a ruling on the joint motion for specific orders and entered an order, nunc pro tunc to May 19, 2022, the date the motion was filed, that posttermination and postadoption visitation with the twins "will be addressed with the [t]rial evidence."  In other words, the judge denied the joint motion for orders more specific than the provisions contained in the findings of fact, conclusions of law, and rationale.  No one appealed from this decision.

In November 2022 and January 2023, Mark, Flavia, and Helen jointly filed a motion and a supplemental motion "to reconsider" that identified the judge's decision, as specified in her findings of fact and conclusions of law, to leave sibling visitation to the discretion of the department and adoptive parents (children's motions).  Supported by exhibits, the children's motions (1) cited G. L. c. 119, § 26B (b); (2) asserted that the department had reduced sibling visits to an

insufficient level and requested an order mandating a specific number of in-person visits plus weekly virtual contact; and (3) requested an evidentiary hearing.  The department opposed the motions and argued that reconsideration was neither timely nor warranted.  At a hearing on February 1, 2023, the judge received offers of proof that the department had reduced sibling visitation by one-half, no sibling visits had been or were then scheduled to occur, and the children wanted to see each other every week if not more.  Reasoning that there was no new evidence and that she had not made an error in her "interpretation of the law . . . that [she could] leave it in the sound discretion of the foster parent if [she] believe[s] that, yes, it's in the best interest of the children," the judge denied the children's motions from the bench.  All three children appealed.

Discussion.  1.  Parental rights.  "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age."  Adoption of Mary, 414 Mass. 705, 711 (1993).  The concepts of parental fitness and a child's best interests "are not separate and distinct but, instead, are 'cognate and connected steps' that 'reflect different degrees of emphasis on

the same factors'" (citation omitted).  Adoption of Ulrich, 94

Mass. App. Ct. 668, 675 (2019).

> "Where there is clear and convincing evidence that the parent is unfit and likely to remain so, we give substantial deference to the trial judge's decision regarding the child's best interests and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.  A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  An abuse of discretion exists where the decision amounts to a clear error of judgment [in weighing the relevant factors, such] that [the decision] falls outside the range of reasonable alternatives."  (Quotations and citations omitted.)

Adoption of Xarissa, 99 Mass. App. Ct. 610, 615-616 (2021).

The mother, the father, and the twins challenge the

sufficiency of the evidence to support the decrees and join in

each other's arguments that the judge made several errors.  The

parties allege that the judge relied on stale evidence and

clearly erroneous findings about Mark's history, needs, and

"sexualized behaviors," the mother's alcohol use disorder, and

the twins' needs and each parent's ability to meet them;[4] weighed

evidence relating to Mark too heavily and pitted his return home

---

[4] In particular, the parties maintain that the judge overstated the needs of each twin and unreasonably inferred that those needs were, at least in part, a result of the parents' caregiving; erroneously found that removal from the foster home would cause each twin "severe psychological and emotional harm"; and weighed the bond between each twin and the foster family too heavily and manipulated the testimony of the bonding expert to reach the conclusions she wanted.

against that of the twins; did not make sufficiently individualized findings about Flavia and Helen or support the decision permanently to separate Mark from the twins with findings that such action was in each child's best interests; and deprived the parents of due process of law by her comments on the eighth day of trial.

Indeed, many of the parties' challenges "amount to no more than a disagreement with the judge's weighing of the evidence and credibility determinations regarding the witnesses," Adoption of Don, 435 Mass. 158, 166 (2001), but "our task is not to decide whether we, presented with the same facts, would have made the same decision," Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999). "We do not sit as a trial court to review de novo the evidence presented by the parties." Adoption of Paula, 420 Mass. 716, 730 (1995). Our review is limited to determining (1) whether the judge erred in concluding, based on subsidiary findings proved by a preponderance of evidence, that there was clear and convincing evidence that the parents were currently unfit to parent each twin and likely to remain so, and (2) whether the judge's conclusion that it was in each twin's best interests to terminate the legal relation between the parents and child was infected by clearly erroneous findings of fact or

any clear error of law or abuse of discretion. See Adoption of Talik, 92 Mass. App. Ct. 367, 370 (2017), and cases cited.

"A judge whose order will have the effect of irreversibly terminating the legal parent-child relationship must focus on the present circumstances of the parent and the child, taking into account recent positive gains (if any), and, in appropriate cases, the likelihood of future improvement, in a parent's ability to care for the child who is the subject of the petition." Adoption of Paula, 420 Mass. at 731. Here, the parents experienced housing instability that was relevant to their fitness to care for the twins.[5] See Adoption of Yvonne, 99 Mass. App. Ct. 574, 580-581 (2021), and cases cited. Also relevant was the parents' failure at every home where they lived with the twins to supervise them properly, maintain a safe and stable environment, or obtain consistent therapeutic services required for the children to thrive. See Adoption of Ulrich, 94 Mass. App. Ct. at 676 (judge may rely on patterns of past conduct to assess parent's future performance and ability). Although the parents engaged in services, their work did not ameliorate the concerns that brought the twins into the department's care, see id. at 677, as they were unable to keep a

---

[5] The parents moved seven times in the four years between the twins' birth and their removal and again the week before trial began.

home clean for any significant period, see Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016), and unable to supervise the twins or Mark closely enough to prevent injuries, including substantial ones,[6] see Bezio v. Patenaude, 381 Mass. 563, 579 (1980) (finding of unfitness "must be predicated upon parental behavior which adversely affects the child").

The parents also struggled with substance use that "was a factor contributing to established neglect" of all three children and therefore relevant. Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008). The judge found that evidence of the mother's alcohol use disorder was not stale based largely on the parents' minimizations of the issue and lack of acknowledgment at trial,[7] but she also discussed what she called "substituted

---

[6] In 2017, the parents failed to notice Helen playing near an industrial dryer at the mother's place of work. Helen's shirt became lodged in the dryer's moving gears, pulling in her arm and resulting in injuries requiring multiple surgeries to reattach her thumb and repair damage to her skin. Throughout 2018, when Mark returned to the residential center after off-site visits with the parents, he frequently had minor injuries. In 2019, Mark collided with a car and broke his arm at a time when the father claimed to have been watching him, and then the parents failed to take him to the hospital until the next day. See Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008) ("Where a parent is ineffective in obtaining medical care for a child, causing neglect of the child, it is relevant to finding of unfitness").

[7] For example, the judge found that the mother did not testify credibly when she claimed to store her prescribed Adderall elsewhere to prevent tempting the father, who by then had relapsed, and that she failed to testify credibly or

behaviors" by the mother, in findings the mother challenges as clearly erroneous.  To the extent that we agree, erroneous findings about drinking soda and gambling do not detract from the judge's ultimate conclusions, because it is clear to us from the larger picture painted by the findings that the judge's concern was not that the mother struggled with addiction.  See Adoption of Katharine, 42 Mass. App. Ct. 25, 32 (1997) (addiction by itself does not necessarily translate into unfitness).  It was that the mother's inability to recognize the severity of the issue, combined with each twin's significant needs requiring recognition and appreciation for the appropriate response, created a risk to Flavia and Helen that the mother would not promptly recognize if, when, or how the twins might need support.[8]  This was not based on stale evidence or clearly erroneous findings.

---

consistently about how much alcohol she consumed at various times throughout the case.  The judge likewise "did not credit Father's testimony regarding his and Mother's use of alcohol."

[8] Flavia "requires supervision to ensure she is not aggressive or overpowering in peer interactions," while Helen "needs consistent redirection and supervision, as she has hygiene, dissociation, and learning difficulties that require skilled caregivers to monitor."  Helen also becomes emotionally dysregulated when correction is used, "even just verbal correction or instruction. . . .  Even when a correction was given by the foster parents in a whisper, [Helen] would sometimes appear to dissociate. . . .  Any kind of physical touch, even a gentle rub on the back, would trigger an aggressive response, usually punching or kicking."

Even after three years of engagement in substance use services that included monthly injections to curb cravings -- a period equaling one-half of the twins' lives -- the mother's sobriety was still "in its infancy." Until July 2021, when the mother "stated that after testifying [on two previous dates] she realized that she is an alcoholic and had begun attending Alcoholics Anonymous," the mother would only say that she had "a problem with drinking." While we commend the mother for her acknowledgment, neither she nor the father demonstrated such understanding or appreciation for "the complex emotional and physical needs of" Flavia and Helen. Adoption of Paula, 420 Mass. at 730. The parents were not aware of either twin's diagnoses or work in therapy; neither expressed what services or supports they would want Flavia or Helen to engage in were they returned home; and they "could articulate no realistic plan for meeting" the needs of either twin or both twins together. Id. Thus, the supported findings "place this case within the line of authority holding that, although a parent's shortcomings, viewed in isolation, would not preclude his or her meeting the law's somewhat undemanding standard of parental unfitness, they nevertheless do so when viewed against the more complex and attention-consuming needs of a child who has been impaired in his development by early neglect." Adoption of Oliver, 28 Mass. App. Ct. 620, 625 (1990).

Similarly, the parents' significant history of domestic violence was not stale even though the relationship had improved by the time of trial, because in their testimony both parents denied and minimized the abuse and its effects on all three children.[9]  The judge found that the twins were clearly affected by the violence because, on removal, Flavia was physically assaultive and verbally dominating to Helen and showed her no empathy, while Helen "was dysregulated, could dissociate, and [also] exhibited some aggressive behaviors."  Solidly based in the evidence, the judge's findings did not overstate Flavia's or Helen's issues or needs, which the judge did not have to be an expert to infer were, at least in part, a result of the parents' caregiving.  "It is well established that exposure to domestic violence works a 'distinctly grievous kind of harm' on children" that can include imperiling their physical safety and psychological development.  Adoption of Talik, 92 Mass. App. Ct. at 374, quoting Custody of Vaughn, 422 Mass. 590, 595 (1996).  See Adoption of Yvonne, 99 Mass. App. Ct. at 578, and cases cited.  This remains true even if the issues were also attributable, in part, to the twins' removal from the home, as the parents maintain.

---

[9] The father frequently perpetrated abuse on the mother while some or all the children were present and was arrested multiple times for assaulting the mother, who at one point obtained an abuse prevention order against him.

The parents' pattern of minimizing responsibility for incidents resulting in harm to all three children, their inability to recognize the effects of the violence on the twins, and their limited understanding of their roles in causing (1) trauma in the family, or (2) all three children to be removed in September 2019,[10] were "compelling evidence for a finding of parental unfitness."  Adoption of Talik, 92 Mass. App. Ct. at 374.  Against this evidence the judge weighed the recent improvements.  She found that the parents' dishonesty "at various junctures regarding issues of critical importance," such as substance use, violence in the home, and significant mental health concerns into which the parents also demonstrated minimal insight and a lack of transparency,[11] combined with their present inability to articulate how they would deal with intrarelationship strife differently or better if any or all the

---

[10] The mother testified that there was no reason for the removal.

[11] The mother denied and minimized diagnoses for which she was prescribed and took medication and made claims about storing her Adderall that the judge did not credit; the father also lied about medications, testifying that he was taking them as prescribed when he had stopped taking them without consulting his psychiatrist.  In addition, while trial was ongoing, the father slept through a scheduled parent-child visit before presenting to a social worker as agitated, anxious, and incoherent -- "conclusive evidence" for the judge that the father had "not developed an appreciation for the severity of his mental health conditions or an adequate understanding of how to manage them or his sobriety effectively."

children were returned to their care, "creates a likelihood that old patterns of abusive and unhealthy behavior may recur" and harm the twins.  See Adoption of Luc, 484 Mass. 139, 146 & n.17 (2020) (parent's mental illness relevant if there is nexus to child's neglect).  This was not a risk to which the judge was required to expose the twins.  See Adoption of Katharine, 42 Mass. App. Ct. at 32.  The "constellation of factors" at play here amply supports the judge's assessment that the mother and the father had not fully addressed their deficiencies to the degree that they would not recur were the twins placed back with them, such that neither parent was or soon would be able to provide Flavia and Helen with a safe, stable home with responsible caretakers dedicated to their safety and well-being. Adoption of Yvonne, 99 Mass. App. Ct. at 582, quoting Adoption of Greta, 431 Mass. 577, 588 (2000).

The foster parents provided their full attention to Flavia and Helen, advocated for them, recognized when extra supports were required, and provided an environment in which each twin's specialized needs were met on a consistent basis.  Consequently, after two years in the "stability and security" of that home, Flavia and Helen "made great strides in overcoming their past trauma, understanding their behaviors, and forming

connections."[12]  Both twins had also formed a strong secondary attachment to the foster family that, the bonding expert testified, "allowed [Flavia and Helen] to stay resilient . . . in the face of some really difficult situations."  It was the judge's sole province to weigh the secondary bond and the twins' "extraordinary progress" in foster care, and we see no error of law or abuse of discretion in her choice to weigh that evidence heavily.  Adoption of Ilona, 459 Mass. 53, 62 (2011).  See Adoption of Daniel, 58 Mass. App. Ct. 195, 202-203 (2003).  "Here we have a case where the [twins] are finally in [a] stable situation[]."  Adoption of Nancy, 443 Mass. 512, 517 (2005).  The judge's finding that removing Flavia and Helen from the foster home would cause severe psychological and emotional harm did not require any manipulation of the expert's testimony; the expert opined that each twin would experience such a removal as a loss, and "it would be important for them to have the supports to negotiate that loss."  Neither the mother nor the father, however, demonstrated an understanding of the harm that either twin would experience if the placement were disrupted, had the initiative and insight to seek out services for Flavia or Helen,

---

[12] Flavia's "aggression [wa]s minimal, and she no longer ha[d] frequent enuretic episodes," while Helen was "able to self-regulate and reengage more quickly after a dissociative episode."

or exhibited the ability to explain to providers why the twins might need services.

As there was clear and convincing evidence to support a conclusion that termination of parental rights was in the best interests of the twins together or as individuals, the judge's findings on these issues were sufficient. See Adoption of Nancy, 443 Mass. at 516; Adoption of Garret, 92 Mass. App. Ct. 664, 675 n.20 (2018). We do not agree that the findings reflect a disproportionate focus on Mark or that the judge treated the twins as a unit. After making seventy-five findings specifically about Mark, thirty-four findings about Flavia, and fifty-two findings about Helen, the judge approved of the department's permanency plans for the twins in part because the "[f]oster parents have already demonstrated their commitment to addressing each child's unique needs." The judge also "ha[d] no doubt" that the foster parents would "treat [Flavia] and [Helen] as individuals despite the fact that they are twins."

We do agree that the judge's focus on Mark's so-called "sexualized behaviors" at the residential center was misplaced due to a lack of a nexus to the twins,[13] but once again we

---

[13] None of the behaviors cited by the judge was directed at the twins or any other young girl or demonstrated after August or September of 2021. Although the judge found that Mark "needs to be touching someone when speaking to them or will try to put his hands on someone when he is talking to them" and that he

conclude that reversal is not required, because the rest of the "findings are amply specific and detailed to support the judge's determination." Adoption of Cadence, 81 Mass. App. Ct. 162, 168-169 (2012). As demonstrated by their omission from our discussion, the findings to which the parties cite are not necessary to the judge's decision. See Care & Protection of Olga, 57 Mass. App. Ct. 821, 825 (2003). Taken as a whole, the judge's analysis reflects appropriate consideration of Mark's history and needs as factors among many bearing on the parents' current and future fitness and the best interests of Flavia and Helen. See Adoption of Luc, 484 Mass. at 145. For the judge, it was the parents' patterns of behavior, not Mark's, that put the twins "at serious risk of peril" if all three children were returned, because she thought it unlikely that the parents would be vigilant about accessing services on behalf of the twins while also doing so for Mark. Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998). Having carefully reviewed the record, "[w]e see no basis for disturbing the judge's view of the evidence." Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997).

---

"exhibited this behavior with the twins during visits as well," she did not find, and there was no suggestion, that the behavior was sexual or negatively affected either twin. To the contrary, the judge found that Mark tried to help Helen when she exhibited dysregulated behavior during visits, and there was testimony that "physical reassurance" helped Helen manage transitions.

Our decision is not changed by information that, in April 2023, while this appeal was pending, a motion by the department to return custody of Mark to the mother was allowed after hearing, and the care and protection petition naming Mark was dismissed. The judge praised the parents for their "demonstrable progress toward being able to address [Mark's] behavioral issues," and so do we. Although we cannot ascertain the reasons from the docket sheet, it is reasonable to think that the department sought to return custody, because after trial the parents had gained the enhanced understanding of trauma and its impact on development that the judge thought necessary to properly care for Mark. When she was making the decisions at issue in this appeal, however, the judge was required "to focus on the present." Adoption of Ramona, 61 Mass. App. Ct. 260, 264 (2004). At that time, each parent "demonstrated a current deficiency in this area." Both "acknowledged that they do not know what [Mark]'s diagnoses are" and were not "prepared with the skills needed to be able to supervise [Mark] were he to return home," despite eight years of engaging with the department and Mark's providers. They were not entitled to an indefinite opportunity to reform. See Adoption of Cadence, 81 Mass. App. Ct. at 166. See also Adoption of Ilona, 459 Mass. at 60 ("childhood is fleeting"). Considering the record "replete with instances in which the

parents demonstrate progress and then regress at the expense of the children," the judge decided on balance that the parents were not then, and would not soon be, in a position if all three children were returned home to ensure each attended appointments and services on time, or to provide the heightened level of supervision that is required to protect the children.  As to the twins, Mark's reunification with the mother does not undermine this analysis.

We are not persuaded by the parties' claim that G. L. c. 119, § 26B (b), creates a presumption that siblings should be placed together, such that specific findings that it was in each child's best interests were required before the twins could permanently be separated from Mark.[14]  In pertinent part, § 26B (b) provides:

> "The court or the department shall, whenever reasonable and practical and based upon a determination of the best interests of the child, ensure that children placed in foster care shall have access to and visitation with siblings . . . if the children or their siblings are separated through adoption or . . . placements in foster care.
>
> "The court or the department shall determine, at the time of the initial placements wherein children and their siblings are separated through placements in foster, pre-

---

[14] The parties also cite to 110 Code Mass. Regs. § 7.101 (2009), in support of this argument, but we do not address the regulatory claim, because it was not raised below.  The joint motion for orders stated that "110 [Code Mass. Regs.] § 7.210 provides that [the department] will provide necessary services to families post-adoption," but this contention is not pressed on appeal.

adoptive or adoptive care, that sibling visitation rights be implemented through a schedule of visitations or supervised visitations . . . ."

Rather than presume they are to be placed together, the statute protects the rights of siblings who "are separated." The rights protected by G. L. c. 119, § 29B (b), relate to "visitation with siblings," not permanent placements, which are governed by a statute that does not mention siblings. As required by G. L. c. 119, § 26 (b), the judge considered the factors enumerated in G. L. c. 210, § 3 (c), and found factors (ii), (iv), (vi), (vii), (viii), and (xii) applicable to Flavia and Helen. See Adoption of Cadence, 81 Mass. App. Ct. at 167. Then she considered the applicable factors along with the department's permanency plans for Flavia and Helen and found that the plans represented the best ones for each twin's "future stability and success." This was not outside the range of reasonable alternatives where, at the time of trial, Mark lived in the residential home and was not "discharge ready." Obviously, the twins could not permanently be placed with him there. There was no evidence that placing Mark with the twins in their preadoptive home was an option, and the judge found it was not in the twins' best interests to be placed with the parents, for all the reasons we have discussed.

The parties' final claim is that the parents were deprived of impartial justice by the judge's comments on the eighth day

of trial, because the comments tipped the scale in the department's favor and reflected bias and prejudgment. Again, we are not persuaded. The department had not yet rested when the judge asked about further evidence, and her comments did not reflect bias when taken in context. In addition to the examples we gave supra, the judge also remarked, "[I]t's not about the [d]epartment not meeting its burden; it's about the cognate and connected issue of what a child's needs are and the parental capacities to meet those needs"; "[M]ind you, I haven't looked at the documentary evidence"; and "I'm not pre-judging the case." The challenged remarks were "issue-spotting alerts," not the sort of premature "weighted assessments of the evidence" that are not permitted, and a close reading of the transcript does not support that the parents were denied due process of law. Adoption of Tia, 73 Mass. App. Ct. 115, 121 (2008). See Adoption of Norbert, 83 Mass. App. Ct. 542, 547 (2013).

2. Posttermination and postadoption visitation with the twins. The parents and the twins challenge the judge's initial decisions to leave postdecree visitation to the discretion of the department and the adoptive parents. All five parties fault the judge for not entering an order on the postdecree sibling visitation motions on February 1, 2023. We review the judge's initial decisions for an abuse of discretion. See Adoption of Xarissa, 99 Mass. App. Ct. at 623-624 (parent-child contact);

Adoption of Garret, 92 Mass. App. Ct. at 680-681 (sibling contact).  The February 1, 2023 order was based on the judge's interpretation of G. L. c. 119, § 26B (b), which we review de novo.  See Adoption of Daphne, 484 Mass. 421, 424 (2020).

a.  For the parents.  Before mandating posttermination and postadoption visitation between a child and parent whose rights have been terminated, a judge must find both that visitation would be in the child's best interests and that those interests will not be adequately served by the preadoptive or adoptive parent's discretion.  See Adoption of Cadence, 81 Mass. App. Ct. at 168.  Absent (1) a reason to question the presumption that preadoptive and adoptive parents will act in a child's interest in evaluating whether such visitation is in the child's best interests now and in the future, or (2) a compelling reason requiring that an order be entered to protect the best interests of a child, judges have discretion to leave decisions about parent-child visitation to the sound judgment of the department and preadoptive or adoptive parents.  See Adoption of Ilona, 459 Mass. at 66.

Here, the judge considered whether posttermination and postadoption visitation with the parents was in each twin's best interests and concluded that it was, because Flavia and Helen both had a primary attachment to the parents.  The judge then considered the foster mother's testimony that her family "would

have an open-door relationship with [the] [p]arents, allowing them to see the twins and facilitating contact, including visits, phone calls, and FaceTime, as long as this was in the best interests of all parties involved."  "[C]onfident that the foster parents will heed the advice of clinicians and other professionals and be conscientious of the twins' trauma histories and other behavioral and medical issues as they continue to care for the girls," the judge concluded that a specific order for parent-child visitation was not necessary to protect either twin's best interests.  Her conclusion was not outside the range of reasonable alternatives.

b.  For Mark.  In support of her initial orders for sibling visitation, the judge found that the foster parents "have demonstrated an understanding of the importance of the twins' connection to [Mark] and have consistently supported the visitation," which prior to the COVID-19 pandemic consisted of biweekly supervised visits by the twins with Mark and both parents.  During and after the pandemic, Mark, Flavia, and Helen had weekly virtual contact with just each other.  Mark looked forward to visits with the twins, asked about them frequently, and spoke about them affectionately.  He was described as "very, very nurturing to his sisters."  Flavia and Helen would like to visit with Mark more often, and their permanency plans recommended "frequent and meaningful contact" with him.  The

judge found that "it is in [Flavia] and [Helen]'s best interests to continue to have sibling visitation with [Mark]."

Explaining her decision to leave the form and frequency of such visits in the discretion of the department and then the twins' adoptive parents, the judge said, "I have . . . a preadoptive [parent] that I have heard from who I feel confident in her judgment in regarding being able to assess what is in the best interest of the [twins], and that she respects the sibling attachments and bond that they have . . . . I've left it in her sound discretion because I believe that, going forward, she will be in the best position to evaluate what is . . . in the girls' best interest."  On this record, we cannot say the judge made a clear error in weighing the factors relevant to the decision such that her initial sibling visitation order falls outside the range of reasonable alternatives.  See Adoption of Garret, 92 Mass. App. Ct. at 680-681.

The children's motions, filed in November 2022 and January 2023, stand on different footing.  While we appreciate that the judge approached the children's motions as ones to reconsider her initial decisions, because that is what the parties asked her to do, substantively, they were "petition[s] for sibling visitation" under G. L. c. 119, § 26B (b), fourth par., and should have been treated as such.  See Care & Protection of Rashida, 488 Mass. 217, 233 (2021), S.C., 489 Mass. 128 (2022),

and cases cited (label attached to motion not dispositive). The judge should have considered not whether there were grounds to revisit her initial decisions, but whether sibling visitation was currently reasonable and practical and in the best interests of the petitioning child and "of the minor siblings with whom visitation is sought." Care & Protection of Jamison, 467 Mass. 269, 277 n.20 (2014). See G. L. c. 119, § 26B (b), first par. If the judge concluded that it was, then she should have entered an order.

It is a general rule of statutory construction "that the use of the term 'shall' imports a mandatory or imperative obligation." Newton-Wellesley Hosp. v. Magrini, 451 Mass. 777, 785 (2008). The rule "is at its strongest when the protection of rights is involved." Commonwealth v. Cook, 426 Mass. 174, 181 (1997). Previously, sibling visitation was governed by a provision of the general care and protection statute that read, in part, "The court shall, whenever reasonable and practical, and based upon a determination of the best interests of the child, ensure that [State-separated siblings] have access to, and visitation rights with, such siblings." G. L. c. 119, § 26 (5), inserted by St. 1997, c. 43, § 99. We said this language meant that a judge must decide whether and if so how sibling visitation is to occur, and then provide a schedule and conditions of visitation, and on further appellate review, the

Supreme Judicial Court "agree[d] that the judge should have specified in an order or orders whether sibling visitation would be in [the subject child]'s best interests; if so, visitation with which siblings; and, if so, the form of visitation (in person contact or otherwise), and the schedule of such visitation." Adoption of Rico, 453 Mass. 749, 753 n.12 (2009), citing Adoption of Rico, 72 Mass. App. Ct. 214, 220-221 (2008).

General Laws c. 119, § 26 (5), was replaced while further appellate review in Adoption of Rico was pending, with a separate section, c. 119, § 26B (b), first par., that twice contains the word "shall" and includes mechanisms for enforcement. See St. 2008, c. 176, § 84. Now, a child in foster care (or the sibling of a child voluntarily placed in foster care) who is "denied visitation rights by the department . . . may appeal through the department's fair hearing process" and then file a petition for review of any decision in the Probate and Family Court, whereupon "[t]hat child or sibling shall have the right to court review by trial de novo." G. L. c. 119, § 26B (b), third par. "For children in the custody of the department," the child or a sibling "may file a petition for sibling visitation in the court committing the child to the custody of the department." G. L. c. 119, § 26B (b), fourth par. If sibling visitation is "reasonable and practical" and in "the best interests of the child," then the court "shall . . .

ensure that [the child] shall have access to and visitation with siblings."  G. L. c. 119, § 26B (b), first par.

These provisions reflect even more strongly a legislative determination that, where siblings who have been permanently separated through no fault of their own "are dissatisfied with the state of visitation" and seek relief under G. L. c. 119, § 26B (b), Adoption of Garret, 92 Mass. App. Ct. at 680 n.25, the judge must "specif[y] in an order or orders whether sibling visitation would be in" the best interests of the petitioning child and each sibling with whom visitation is sought "and, if so, the form of visitation (in person contact or otherwise), and the schedule of such visitation."  Adoption of Rico, 453 Mass. at 753 n.12.  See id. at 757 n.16; Adoption of Zander, 83 Mass. App. Ct. 363, 367 (2013).  As the court stated in Adoption of Rico, supra at 756-757, "The additional, but highly significant, value of a court order" in this context is that it "provides clarity and, perhaps more importantly, gives the child a present sense of security about [their] ability to maintain contact and a relationship with a person who has been shown to be critical to [them]"; it provides "protection to the child that is absent if the judge leaves all visitation matters up to the department and future adoptive parents."  Although in that case the court was discussing parent-child visitation, which differs from sibling visitation in material respects, its reasoning also

applies here.  Whereas the department has an independent obligation under the statute to ensure sibling visitation, adoptive parents are not so obligated.  See Adoption of Garret, supra at 679-681; Adoption of Zander, supra.

While the statute does not expressly state whether a de novo trial may be had on a petition filed pursuant to G. L. c. 119, § 26B (b), fourth par., it is clear to us as a result of the change in circumstances, specifically Mark's reunification with the parents, that further evidence will be required before the judge can enter an appropriate order under G. L. c. 119, § 26B (b).  See Adoption of Rico, 453 Mass. at 758 ("current context is critical" to assessing child's best interests).  For these reasons, the children's motions, filed in November 2022 and January 2023, are remanded for evidentiary hearing and entry of an order.  In the interim, the judge should consider whether a temporary order for sibling visitation is reasonable, practical, and in the current best interests of Mark, Flavia, and Helen.  See G. L. c. 119, § 26B (b), first par.

Conclusion.  The decrees terminating the mother's and father's parental rights are affirmed.  The order entered February 1, 2023, denying the children's motions, is vacated, and the matter is remanded for consideration of those motions consistent with this opinion.

So ordered.